**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **INDIANAPOLIS AIRPORT** | ) | |
| **AUTHORITY**, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:13-cv-1316-JMS-TAB |
| | ) | |
| v. | ) | |
| | ) | |
| **TRAVELERS PROPERTY CASUALTY** | ) | |
| **COMPANY OF AMERICA**, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**TRAVELERS PROPERTY CASUALTY COMPANY OF AMERICA'S RESPONSE IN OPPOSITION TO IAA'S MOTION TO COMPEL**

**I.      INTRODUCTION**

Indianapolis Airport Authority ("IAA") has filed this Motion to Compel, seeking wholesale production of Travelers Property Casualty Company of America's ("Travelers") attorney-client and work-product communications.  IAA offers no support, other than the arguments of its counsel, for IAA's blanket (and factually incorrect) arguments that Travelers' attorney, Murray Sacks, didn't really act as an attorney throughout the six year claims process and that Travelers could not have anticipated litigation until it sent its July 10, 2013 claims decision.  IAA's Motion is deliberately vague in its presentation of the documents that it seeks to compel to leave the impression that at no time in this $16.5 million coverage case did Travelers have any attorney-client or work-product communications.   Rather, without even a shred of evidence, IAA baldly argues that Travelers' counsel, from whom Travelers' adjusters sought legal opinions and advice relating to the numerous complex coverage issues that surfaced, merely acted as a glorified claims handler for which no privilege purportedly exists.

In the same vein, IAA's Brief leaves the inaccurate impression that litigation was never anticipated until July 10, 2013 when Travelers issued a claims decision letter explaining why no further payments could be made. Both arguments are not only incorrect, but are clearly undermined by IAA's own acts and communications which demonstrates that **IAA** anticipated litigation as early as January 25, 2007 and throughout the six years prior to Travelers' claims decision. This is best evidenced by IAA's own work product assertions for the documents that it has withheld in the pre-July 10, 2013 timeframe and seeks to protect on the same basis.[1]   It is also evidenced by IAA's repeated threats of litigation prior to July 10, 2013 and its two dozen requests between 2009 and 2013 that Travelers toll the statute of limitations in the policy to extend the date for IAA to commence suit against Travelers.  This alone is prima facie evidence that IAA anticipated litigation well before any claim decision. *See FDIC v. Fid & Deposit Co. of Maryland*, No. 3:11-CV-19-RLY-WGH, 2013 WL 3989140 at *4 (S.D. Ind. August 2, 2013).

It is also evidenced by Travelers' multiple Reservation of Rights letters to IAA, memorializing the numerous coverage issues as the claim developed (and which, not coincidentally are the same issues that are still at issue in this matter).

IAA's Motion also seeks discovery of specific attorney-client and work-product communications between separate Travelers' subrogation claims handlers and counsel, again

---

[1] It is particularly interesting that IAA urges production of attorney-client communications in this context, when its own counsel, Ice Miller, served as IAA's sole claims agent in communication with Travelers pre-claims decision and has withheld its own similar communications prior to July 10, 2013 on the basis of work product.  *See e.g.* IAA's various privilege logs demonstrating this fact (**Exhibit 1**). Accordingly, to the extent that this Court orders production of attorney-client communications on the basis that Travelers' counsel was not acting as an attorney, then IAA is exposing its own claims agent, Ice Miller and its withheld communications to the same scrutiny.  It is well-settled that "legislatures create evidentiary privileges to shield selected information from discovery, and those shields may not be wielded as swords at the will of a party." *Madden v. Ind. Dep't of Transp.,* 832 N.E.2d 1122, 1128 (Ind.Ct.App.2005).

misrepresenting the nature of those attorney-client and work-product communications.  While IAA's lawyers' arguments contend that any withheld or redacted communications relating to subrogation are not privileged because they are communications made in the ordinary course of the claims handling, the actual evidence and redactions show otherwise.  Travelers has only withheld those specific communications by and between Travelers and its outside subrogation counsel who were specifically hired to provide legal advice and opinion regarding the completely separate and unrelated issue whether subrogation litigation could be pursued.  Said communications as well as the internal notes of Travelers' separate subrogation claims handlers who were involved solely in the anticipated pursuit of future litigation (or decisions not to as the case may be) are clearly both attorney-client and work-product communications that are privileged from production.

Finally, despite the Magistrate's initial comments during the August 15, 2014 conference call to discuss the issues raised in this Motion that amount of reserves has no relevance to the issues in this case, IAA has nevertheless continued in its pursuit of reserve amounts -- dollar amounts which are mandated by IC 27-1-13-8(c) -- which numerous courts, including this district, have recognized bear no relevance to any coverage issue and therefore do not warrant production.

For the reasons more fully outlined below, this Court should deny Plaintiff's Motion to Compel in its entirety.  However, at the very least, before ordering production of any attorney-client and work-product communication, Travelers requests that this Court first conduct an *in camera* inspection of any document considered for production to protect against disclosure of privileged communications.

## II.     FACTUAL BACKGROUND

### A.     The Coverage Dispute

The instant litigation arises out of a coverage dispute between IAA and Travelers relating to a January 24, 2007 failure of two shoring towers during the construction of the New Midfield Terminal Project at the Indianapolis International Airport (**Dkt. 35**).  After this incident, IAA made an insurance claim to Travelers under a Commercial Inland Marine/Builder's Risk insurance policy in force at the time.  The adjustment of this claim lasted 6 years, in large part due to the numerous extensions granted to IAA to file its Sworn Statement in Proof of Loss (which did not occur until July 2012) and numerous extensions of the policy's suit limitation period to allow IAA to locate documentation purportedly supporting its claims.  Travelers ultimately paid IAA in excess of $4.2 million, representing the total amount of loss, costs and damages that were covered by the policy. After receiving all of the documents that IAA was willing to present, Travelers' wrote a July 10, 2013 letter outlining for IAA the basis for its $4,194,357 payments made as of that date and informed IAA of the claimed costs and expenses that were not covered by the various existing terms, conditions, limitations and exclusions in Travelers' policy (**Exhibit 2**).  A month later, IAA commenced this litigation seeking recovery of an additional $9 million of construction costs and expenses that IAA maintains were caused by the January 24, 2007 incident and are covered by Travelers' policy (**Dkt. 1** and **Dkt. 35**). Five months after IAA commenced this litigation, it sought to amend its Complaint to assert another $7 million claim for recovery of "soft costs" for which IAA previously had advised Travelers that it was not making a claim (**Dkt. 27** and **Dkt. 30**).  The issues presented in this case include whether any of IAA's $16.5 million of additional claimed costs and expenses are covered, limited or excluded by the various policy provisions.

4

**B.**     **Background Regarding The Claim And The Claims Investigation**

In order for this Court to have an understanding of the propriety of the privileges asserted by Travelers' for the documents at issue, it is important for this Court to have an understanding of the players and the activities of Travelers' personnel. IAA notified Travelers of the subject loss on January 24, 2007.  Travelers' General Adjuster, Nancy Fisher (now deceased) was assigned to handle the claim.  Ms. Fisher remained involved with the claim from January, 2007 until the Spring of 2012 when she passed away.  The claims handling was then transferred to Elaine Bedard who acted as the primary claims handler thereafter.  Throughout the six years of claims handling, Ms. Fisher and Ms. Bedard acted as the sole claims handlers who, communicated directly with IAA and its representatives.

As of January 31, 2007, Travelers knew enough information to realize that the facts and circumstances of this claim potentially implicated numerous complex coverage issues (**Exhibit 3**, TRV CLM 000426-430). To that end, beginning on January 31, 2007 Ms. Fisher contacted attorney Murray Sacks, employed by Travelers' separate claim legal department (*id.*). Ms. Fisher also contacted other counsel to assist with coverage analysis (**Exhibit 3**, TRV CLM 000424). Ms. Fisher initially sought Mr. Sack's legal advice and assistance in preparing a Reservation of Rights ("ROR") letter which is not typical to every claim (*id.*). Travelers' initial ROR letter was sent on February 6, 2007 (IAA Exhibit L, **Dkt. 68-13**, Pg ID #999-1000). During a February 9, 2007 meeting with IAA, Ms. Fisher's contemporaneous notes state that "Policyholder made aware that coverage investigation is ongoing and until cause of event is determine[d] and extent of damage, no commitment can be made under the policy with respects to coverage for this event.  It should be noted that the policyholder is of the opinion that this is a covered event. Agreed to submit Reservation of Rights to Jay McQueen, IAA representative." (**Exhibit 3**).

Immediately upon receipt of this letter, Hunt Smoot's[2] General Counsel, Jose Pieknagura, corresponded with Travelers on its and IAA's behalf.  Mr. Pieknagura acknowledged the existence of coverage issues and the tone and request of the correspondence made it clear that Hunt Smoot and IAA disagreed with Travelers' coverage position (**Exhibit 4**). Given the involvement of counsel for the policy holder, Mr. Sacks was requested to remain involved and from time to time had communications with Mr. Pieknagura, and later IAA's counsel, Ice Miller (**Exhibit 5**). In February 2007, there were conference calls and meetings between Travelers, its counsel, Mr. Sacks and IAA and its counsel to discuss the various coverage issues that had arisen (**Exhibit 5**). Attorney Sacks also notified Mr. Pieknagura that Travelers was working on a coverage position letter which would be provided (*id.*).  Mr. Sacks also met with IAA's and Hunt Smoot's counsel about coverage (**Exhibit 13**).   This correspondence memorializes Attorney Sack's role in providing legal advice to Travelers regarding coverage.

Ms. Fisher updated and supplemented her early ROR letters on numerous occasions throughout the life of the claim with more detailed ROR letters outlining additional coverage issues and disputes between the parties (see **Exhibit 6**, ROR ltrs dated 3/6/07, 4/23/07, 5/16/07, 1/28/09 and 3/27/09.  Travelers' March 6, 2007 and May 16, 2007 correspondence (**Exhibit 6**, TRV CLM 002020-2026; 000538-540) recognize the significance of the coverage issues and the May 16, 2007 letter specifically acknowledges that these coverage issues and disputes might lead to litigation (*id*.). Throughout this timeframe, Travelers continued to consult with its attorney Murray Sacks for legal advice and opinions on issues that arose or issues that Ms. Fisher would

---

[2] Hunt Smoot, the Construction Manager for this project, is listed as an additional insured on Travelers' policy.

inquire about from time to time.[3] Subsequently, Elaine Bedard sought legal advice from Mr. Sack's replacement, Attorney Chris Perry in 2012 (**Exhibit 3**, TRV CLM 000260-261, 264-265).

At no time did either Mr. Sacks or Mr. Perry ever hold themselves out as the claims handler, nor did they handle any day to day claims handling functions.  Rather, their involvement was largely to provide legal advice and opinions regarding the ongoing claim, communicate counsel to counsel with IAA's attorneys on legal issues regarding coverage and attend calls and meetings as Travelers' counsel from time to time as requested by Travelers' claims adjuster. Accordingly, the types of documents that have been redacted contain those internal attorney-client communications relating to those activities. *See* Travelers' Claim Notes which bear this out (**Exhibit 3**).

In September 2007, consistent with the ongoing dispute over coverage, IAA's counsel, Alan Goldstein from Ice Miller became involved.  From that time on, there were numerous instances of IAA specifically requesting extensions to file suit against Travelers as follows:

- 1/14/09 (**Exhibit 3**) ("TRV CLM 000344 "On 01/14/2009 - Sent letter (electronically) to insured's attorney, Alan Goldstein, extending period to file suit to and including 6/24/2009");
- 6/15/09 (**Exhibit 3**) (TRV CLM 000334 "Sent letter (electronically) to Alan Goldstein extending time period to file suit to and including August 31, 2009.");
- 8/24/09 (**Exhibit 3**) (TRV CLM 000332 - In response to 8/20/2009 request from Alan Goldstein "'[w]ill you agreed [sic] to an additional 60 day extension to October 30, 2009" Ms. Fisher "Prepared and sent letter electronically to Attorney, Alan Goldstein, extending time period to file suit to and including 10/30/2009.");
- 10/23/09 (**Exhibit 3**) (TRV CLM 000331 - In response to 10/21/2009 request from Alan Goldstein "I would appreciate you extending the October 31st deadline for suit to December 31" Ms. Fisher "Sent letter to Alan Goldstein, extending the time period to file suit to and including December 31, 2009.");

---

[3] (*See e.g.* redactions in Travelers' claim notes found in **Exhibit 3** at the following pages, "Claim Notes", TRV CLM 000270-271, 276, 279, 281, 285-287, 290-291, 299, 310-311, 317-318, 323-325, 333, 335-337, 339, 341, 343-345, 352, 357-358, 362, 364, 368-370, 372, 374-375, 383, 385, 392, 397, 404, 406, 409-411, 413, 414, 417, 419-422, 426, 428, 430)

- 12/18/09 (**Exhibit 3**) (TRV CLM 000325-326 - In response to 12/15/2009 request by Attorney Goldstein, "Travelers is granting your request for extending the time period to file suit to and including January 31, 2010.");
- 1/26/10 (**Exhibit 3**) (TRV CLM 000324)(timeframe to file suit extended to 3/1/2010);
- 2/05/10 (**Exhibit 3**) (TRV CLM 000322-323)(timeframe to file suit extended to 6/30/2010);
- 6/16/10 (**Exhibit 3**) (TRV CLM 000304)(timeframe to file suit extended to 9/30/2010);
- 8/05/10 (**Exhibit 3**) (TRV CLM 000300)(timeframe to file suit extended to 1/24/2011 due to Attorney Goldstein's surgery, Travelers noted that this will be the last extension – 4 year anniversary of claim);
- 1/14/11 (**Exhibit 3**) (TRV CLM 000290-291 – due to, *inter alia*, Attorney Goldstein advised Ms. Fisher "if Travelers would not grant another extension that he would have no other option but to file suit." Timeframe to file suit extended to 03/24/2011);
- 03/11/2011 (**Exhibit 3**) (TRV CLM 000287 – based on Attorney Goldstein's representation that IAA would be submitting its soft cost information the week of 3/14/2011 Travelers extended time period for filing suit to June 30, 2011);
- 06/20/2011 (**Exhibit 3**) (TRV CLM 000279 – Travelers extended time period for filing suit to September 30, 2011);
- 09/26/11 (**Exhibit 3**) (TRV CLM 000275 - time period for filing suit extended to December 31, 2011);
- 12/29/11 (**Exhibit 3**) (TRV CLM 000270 - per IAA request Travelers granted a further extension of the suit limitation period to June 30, 2012);
- 6/20/2012 (**Exhibit 3**) (TRV CLM 000266)(per IAA request suit limitation period extended additional 30 days to 7/31/12);
- 7/20/12 (**Exhibit 3**) (TRV CLM 000262) (Travelers agrees to extend suit limitation period to 8/31/2012;
- 8/17/12 (**Exhibit 12**) (TRV CLM 000191-196 (("If Travelers will not agree to either 1 or 2 above [a meeting to negotiate resolution of the claim or "private judge litigation"/arbitration], then IAA will proceed with filing suit . . .);
- 8/29/12 (**Exhibit 12**) (TRV BEDARD 000215 – request to extend suit limitation period to 10/30/12);
- 10/16/12 (**Exhibit 12**) (TRV BEDARD 000128)(IAA (Attorney Seamands) request to extend suit  limitation deadline to 11/30/12 granted by Travelers' Adjuster Elaine Bedard);
- 10/29/12 (**Exhibit 12**) (TRV BEDARD 000130-131)(Travelers agrees to extend period to file suit);
- 11/16/12 (**Exhibit 12**) (TRV CLM 000197-201) (IAA requests to extension of period for filing suit to 1/15/13);
- 1/9/13 (**Exhibit 12**) (TRV BEDARD 000123 – IAA request to extend period for filing suit extended to 2/28/2013);
- 2/18/13 (**Exhibit 12**) (TRV BEDARD 000140)(IAA request to extend suit limitation deadline to 3/31/13);

- 4/25/13 (**Exhibit 12**) (TRV BEDARD 000183)(IAA requests to extend suit limitation deadline);
- 5/22/13 (**Exhibit 12**) (TRV BEDARD 000175)(IAA request to extend suit limitation deadline to 6/30/13 granted by Travelers); and
- 6/27/2013 (**Exhibit 12**) (TRV CLM  000165-168)(Letter from Attorney Seamands citing "significant legal issues regarding coverage on which IAA and Travelers disagree" and that "[t]he amounts in dispute also are significant" IAA proposes a "pre-suit meeting/negotiation" or mediation).

Over a year before Travelers provided IAA with its July 10, 2013 claims decision, IAA's counsel, Ice Miller and Travelers' claims adjuster, Ms. Bedard, had engaged in numerous substantive communications that crystallized the disagreement in the parties' positions regarding coverage.  IAA repeatedly reiterated in communications between July, 2012 and July 10, 2013 the significant differences between the parties' positions and IAA's clear intent to sue Travelers if it did not get its way.  This is best memorialized in attorney Goldstein's January 14, 2011 conversation with Ms. Fisher directly advising her of IAA's plan to commence litigation (**Exhibit 7**, TRV CLM 002380) and again in Ms. Seamands' August 17, 2012 communication attached as **Ex 6**, TRV CLM 000192-197):

> ...If Travelers is intent on pursuing this course of demanding overly broad, irrelevant information, at a time that exponentially increases the burden on IAA in attempting to respond, before any progress can be made in resolving this claim, then **IAA would be better off doing any further document production in the context of litigation, with all of the attendant limitations and other protections under the discovery rules**.
>
> *   *   *
>
> …IAA **plans** to pursue one of three options to bring this claim to a conclusion:
>
> I. As previously requested, IAA is willing to meet with Travelers to negotiate a resolution of this claim, which must be accomplished by no later than August 29, 2012 given the August 31,2012 deadline for filing suit.
>
> 2. In the absence of such a final resolution by August 29, IAA proposes that the parties submit this matter to either private judge litigation or to binding arbitration to be held in Indianapolis, the procedures for which to be mutually agreed to by August 29, 2012, in order that a resolution might be expedited. Such agreement must include an extension of IAA's time to file suit in order to accommodate the initiation of such an action per agreed parameters. Such

agreement also must include that there will be a final decision by the end of this year.

   3. If Travelers will not agree to either I or 2 above, then **IAA will proceed with filing suit** so that any document production is done in the context of litigation and the parties are assured this matter is moving toward a final resolution. IAA will seek attorneys' fees, costs of litigation, exemplary damages and prejudgment interest if it is forced into litigation to collect the amounts that are owing, and have been owing, for some time. (emphasis added).

## C. <u>Procedural History Regarding This Motion</u>

  IAA's factual recitation reveals the inordinate amount of time and expense that IAA has spent (and forced Travelers to spend) to address documents that are legitimately privileged from discovery based on the very same privileges that IAA has used to protect hundreds of its own withheld documents for the same reasons (see, e.g., **Exhibit 1**).  Accordingly, to the extent that this Court orders any production of privileged attorney-client communications or work-product in this case, then this Court must similarly order production of the same documents that IAA has withheld and sought to protect in discovery.

## III. <u>ARGUMENT</u>

## A. <u>Standard Of Review</u>

  IAA's legal authority presents an incomplete statement of the burden of proof to establish the attorney-client privilege under Indiana law. As noted by this Court in *Rockies Express Pipeline LLC v. 586 Acres*, No. 1:08-CV-0751-RLYDML, 2009 WL 5219025 at *3 (S.D. Ind. December 31, 2009), where Travelers has established the existence of an attorney-client relationship and a confidential communication, the burden shifts to IAA:

> **A.** *Attorney-client Privilege*
> Indiana law has long provided "when an attorney is consulted on business within the scope of his profession, the communications on the subject between him and his client should be treated as strictly confidential." *Bassett v. State,* 895 N.E.2d 1201, 1206 (Ind.2008). The burden of proof is on the person asserting the privilege to show that the consultation was a professional one. *Id.* The essential

prerequisites to show the applicability of the privilege are (1) the existence of an attorney-client relationship, and (2) the exchange of a confidential communication. *Mayberry v. State,* 670 N.E.2d 1262, 1266 (Ind.1996). *When the party seeking to invoke the privilege has shown that the prerequisites have been satisfied, the burden shifts to the party opposing the assertion of privilege to show that the communications are not protected because the confidentiality was waived or otherwise nullified. Bassett,* 895 N.E.2d at 1206. [Emphasis added].

IAA also mischaracterizes the parties' relative burdens of proof with regard to the work product doctrine under federal law. As further noted by this Court in *FDIC v. Fid & Deposit Co. of Maryland*, No. 3:11-CV-19-RLY-WGH, 2013 WL 3989140 (S.D. Ind. August 2, 2013):

> The party seeking to shield work product from discovery bears the burden of proof. *See, e.g., Mullins v. Dep't of Labor of Puerto Rico,* 269 F.R.D. 172, 175–76 (D.P.R.2010). *Once the asserting party satisfies its burden of establishing that disputed material was prepared in anticipation of litigation, the burden shifts to the party requesting discovery to show (1) a substantial need of the materials to prepare his case and (2) the inability, without undue hardship, to obtain the substantial equivalent of the materials by other means.* Fed. R. Civ. P. 26(b)(3)(ii) (numbering added); *Suson v. Zenith Radio Corp.,* 763 F.2d 304, 308 n. 2 (7th Cir.1985).

**B.**   **Travelers' Attorney-Client Communications Between Travelers and Its Counsel Are Absolutely Privileged From Discovery Because At All Times Travelers' Counsel Acted In Their Capacities As Attorneys**

State law governs the issue of privilege in this civil diversity case. Fed.R.Evid. 501. *Cummins, Inc. v. Ace Am. Ins. Co.*, 1:09-CV-00738-JMS, 2011 WL 1832813 (S.D. Ind. May 2, 2011)(Debra M. Lynch, M.J.) (citing *Lorenz v. Valley Forge Ins. Co.,* 815 F.2d 1095, 1097 (7th Cir.1987) (Indiana attorney-client privilege law applied in diversity case). The parties do not contest that Indiana substantive law applies in this action.

In *Cummins*, Magistrate McVicker Lynch succinctly summarized applicable Indiana law with regard to the attorney client privilege (*id.*). The scope of Indiana's evidentiary attorney-client privilege is codified at Ind.Code § 34–46–3–1, and provides that testimony regarding attorney-client communications **will not** be required from "attorneys, as to confidential

11

communications made to them in the course of their professional business, and as to advice given in such cases." (*Id.*). The intent of the privilege is to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." (*Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981)).). *See also Med. Assur. Co., Inc. v. Weinberger*, No. 4:06 CV 117, 2013 WL 501746 (N.D. Ind. Feb. 7, 2013)(citing *Cummins*). "The privilege assures a client that it can provide complete and candid information in confidence to its counsel and counsel in turn can provide complete and candid legal advice about the client's rights and liabilities without fear that the confidences will be revealed. *Cummins*, at *1, (citing *inter alia*, *Corll v. Edward D. Jones & Co.*, 646 N.E.2d 721, 724 (Ind.Ct.App.1995) (the privilege "applies to all communications between the client and his attorney for the purpose of obtaining professional legal advice or aid regarding the client's rights and liabilities").

Indiana has also recognized that the attorney-client privilege also applies in the corporate context, including the application of the privilege to in-house/house counsel, such as Travelers' in-house attorneys, Murray Sacks and Chris Perry, as noted in *Newton v. Yates*, 170 Ind. App. 486, 353 N.E.2d 485, 490 (1976):

> Corporations can, of course, avail themselves of the attorney-client privilege if the attorney was consulted in a legal capacity. *Radiant Burners, Inc. v. America Gas Ass'n*, 320 F.2d 314, 98 A.L.R.2d 228 (7th Cir. 1963). In addition, the attorney-client privilege is also extended to attorneys who are exclusive employees of a corporation (house counsel). [Citation omitted].

> *See also*, *Sullivan v. Fairmont Homes, Inc*., 543 N.E.2d 1130, 1134–35 (Ind. Ct. App. 1989) ("we are inclined to agree with Fairmont Homes that [Fairmont' employee's] communications with [in-house corporate counsel] are privileged…" (citing *Upjohn Co. v. U.S.*,

449 U.S. 383, 101 S. Ct. 677, 66 L. Ed. 2d 584, 7 Fed. R. Evid. Serv. 785, 30 Fed. R. Serv. 2d 1101 (1981))).

This Court in *Cummins* relied on the Indiana Court of Appeals' decision in *Hartford Financial Services Group, Inc. v. Lake Cnty. Park and Recreation Board,* 717 N.E.2d 1232 (Ind.Ct.App.1999) which is also instructive. The *Hartford Financial* court specifically held that communications by outside attorneys to an insurance company **before** the insurer and its insured began litigating coverage are still protected by the attorney-client privilege, adopting the reasoning of *Aetna Cas. & Surety Co. v. Superior Court*:[4]

> [C]onsultations regarding a policy of insurance between an insurance company and its attorney prior to the time the insurance company has accepted its obligations under that policy are protected by the attorney-client privilege vis a vis the person insured by the policy. Such a rule makes perfect sense, as <u>an insurance company should be free to seek legal advice in cases where coverage is unclear without fearing that the communications necessary to obtain that advice will later become available to an insured who is dissatisfied with a decision to deny coverage.</u> <u>A contrary rule would have a chilling effect on an insurance company's decision to seek legal advice regarding close coverage questions</u>, and would disserve the primary purpose of the attorney-client privilege—to facilitate the uninhibited flow of information between a lawyer and client so as to lead to an accurate ascertainment and enforcement of rights.....

Similarly, in *Hartford Financial, supra.*, the Court found no indication that Hartford's counsel was acting in any role other than as an attorney and was not an outside claims adjuster (*id.*). The court stated: "[s]*imply put, Hartford retained counsel to investigate [its insured's] claim, render legal advice and make a coverage determination under the policy.*" (*Id.*, emphasis added). The court concluded that communications between the lawyer and client leading up to the coverage determination were privileged (*id.* at 1238). See also, *Illiana Surgery and Medical*

---

[4] 153 Cal.App.3d 467, 474, 200 Cal.Rptr. 471, 474 (1984).

*Center LLC v. Hartford Fire Ins. Co.,* 2010 WL 4852459 (N.D.Ind. Nov.18, 2010)(insurer's retained attorney conducted EUOs, attended inspections of the insured's facilities, but never provided a coverage opinion), and *Cummins,* 2011 WL 1832813 at *3 (S.D. Ind. May 2, 2011)("Indiana thus rejects the view…that an attorney who advises an insurance company client whether the facts of an insured's loss fit within various terms of the policy is acting as a claims adjuster" (citing Hartford Financial at 1238)).

The communications by Travelers' and its counsel before Travelers and IAA began litigating coverage are protected by the attorney-client privilege, where Travelers employed and retained legal counsel to interpret the policy, investigate the details surrounding the damage, and to determine whether Travelers was bound for all or some of the damage, e.g., a "classic example of a client seeking legal advice from an attorney." *Hartford*, *supra*, 717 N.E.2d at 1235-36.

IAA argues that Travelers' improperly redacted or refused to provide certain documents which suggest to IAA that counsel for Travelers may not have been acting as an attorney. To that end, IAA claims that the descriptions on Travelers' privilege log to which Travelers asserted the attorney-client privilege appear to involve an attorney performing non-legal functions, citing Travelers' assertion of the attorney-client privilege "as to documents regarding change order language;"[5] "IAA's proof of loss and claim submission;"[6] "and various substantial completion dates associated with the Project."[7]

IAA's summary of the reasons for Travelers' assertion of privilege, "cherry picks" language from Travelers' Privilege Log which, out of context, appears to support IAA's

---

[5] (citing IAA's Exhibit H, at 37 (TRV FISHER CLM 022344, 022349), at 39 (TRV FISHER CLM 022457, 022459), at 42 (TRV FISHER CLM 023372, 024161))

[6] (*id.* at 12 (TRV FISHER CLM 011609), at 55-56 (TRV FISHER CLM 027203, 027204-27206), at 70 (TRV CLM 00364), at 87 (TRV CLM 01984-1993))

[7] (*id.* at 69 (TRV CLM 00335-336), at 96 (TRV CLM 02339))

argument, and omits language from Travelers' privilege log providing precisely the description that IAA claims is lacking. The descriptions for every one of the documents highlighted by IAA describe the documents as involving communications directly with counsel, wherein the two claims handlers, Ms. Fisher and Ms. Bedard, solicited legal advice and opinions from Travelers' in-house and retained counsel on a variety of legal issues that arose while Fisher and Bedard were performing the adjustment of IAA's claims, including: the legal implications of language contained in change orders; the legal import of the insufficiency of IAA's Proofs of Loss or partial Proofs of Loss, responses thereto and whether a request for a revised Proof of Loss or extension of time for Proof of Loss may have legal implications (i.e., waiver and/or estoppel); legal opinions and strategy regarding coverage issues; and regarding legal opinions and analysis related to substantial completion dates, which is the principal temporal trigger for the viability of any soft cost claim.[8]

In fact, according to IAA's own attorneys' letter of July 23, 2014, (**Exhibit 8**, Pages 2-3 of 4), in response to Travelers challenge to IAA's assertion of privilege for virtually the identical categories of documents, (where IAA's attorneys actually did act as the sole claims agents for IAA – unlike Travelers attorneys) were performing non-attorney functions, IAA justified its assertion of privilege for the same reasons asserted by Travelers:

> …Travelers' assertion that certain communications involved attorneys who were not "acting as attorneys," is misplaced. As reflected in the Hunt/Smoot privilege log, Document No. 10 is an e-mail chain, with the first e-mail **requesting that**

---

[8] (See detailed "descriptions" in Travelers' Second Amended Privilege Log August 5, 2014, IAA Exhibit H, for Travelers' assertion of the attorney-client privilege for documents: TRV FISHER CLM 011609 (Dkt. 68-8, Page ID # 878); 022344, 022349 (*id.*, Page ID # 903); 023372, 024161 (*id.*, Page ID # 908); 027203 (Dkt.68-9, Page ID # 921) ; 027204– 027206 (*id.*, Page ID # 922) ; TRV CLM 000335 – 000336 (*id.*, Page ID # 929); 000364 (*id.*, Page ID # 936);  001984– 001993 (*id.*, Page ID # 953); and 002339 (*id.*, Page ID # 962)).

**Hunt's counsel (Jose Pienknagura) and others review proposed contract change orders**, and the second e-mail discussing a subsequent meeting with attorney McQueen regarding these issues. Document No. 11 is **an email chain between Jose Pienknagura and Hunt and IAA management containing various questions, answers, and directions given regarding Hunt's attorneys' analysis of various issues**. Document No. 15, **drafted by Anne O'Connor, provides Hunt/Smoot and IAA with action items, all of which involve legal advice**. Document Nos. 22 and 24 are Mark Flandermeyer's handwritten **notes from meetings he had with attorneys Jay McQueen, Anne O'Connor, and Alan Goldstein, regarding numerous legal issues**. And Document Nos. 42 and 46 involve **a request for legal advice and subsequent response from Anne O'Connor**. **Because these documents reflect the seeking and giving of legal advice, they are protected by the attorney-client privilege**. [*Id.,* Pages 2-3 of 4].

The actual descriptions provided in IAA's own Privilege Logs (**Exhibit 1**), regarding the exact same categories of documents over which IAA also asserted the same attorney client privilege as Travelers, are virtually identical, except that IAA's privilege logs provide **far less** descriptive information than Travelers' privilege logs. IAA's Privilege Logs rarely bother to identify the categories of documents over which IAA is asserting the privilege. In addition IAA's descriptions typically go no further than, e.g., "e-mail discussing meeting with attorneys for the purpose of obtaining legal advice," "for the purpose of obtaining legal advice relating to communications with Travelers" or "*reflecting legal advice regarding insurance claim*" or the quintessential indicator that IAA's attorneys were themselves acting as "super adjusters": "Update on progress of information gathering at attorney request."[9]

Many of Travelers' redacted documents are claim notes summarizing conversations with Attorney Sacks relating to his conversations with IAA's counsel (**Exhibit 3**, TRV CLM

---

[9] (See, e.g., **Exhibit 1**, IAA's Supplemental Privilege Log Hunt Smoot production set 01 for the assertion of the attorney-client privilege re: documents # 10, 11, 15, 22, 24, 46, 46) and **Exhibit 8**, July 23, 2014 Ltr. fr. Atty. Jenny R. Buchheit of Ice Miller to Atty Chapnick, et. al., Pages 2-3 of 4).

000333),[10] his impressions and opinions regarding coverage issues such as dates of substantial completion which lean on soft cost coverage (**Exhibit 3**, TRV CLM 000335-336, 2339), the legal implications of the Qui Tam action filed against IAA's subcontractors (**Exhibit 3**, TRV CLM 000352) and legal opinions and recommendations regarding the impact of partial Proofs of Loss (**Exhibit 3**, TRV CLM 000364); recommended legal advice and opinions and revisions to various letters (**Exhibit 3**, TRV CLM 000375, 392) by Attorney Sacks and later Attorney Perry who assumed the role as in house counsel from Mr. Sacks (**Exhibit 9**, TRV CLM 1984-1986, 1987-1989, 1990-1991, 1992-1993).

Accordingly as indicated in Travelers' privilege log, each of the categories of documents cited by IAA clearly involve requests for legal advice to Travelers counsel from the individuals who were actually adjusting IAA's claim on Travelers' behalf. Therefore Travelers has carried its burden of proof to show that "the consultation was a professional one," *Rockies Express, supra; Mayberry, supra*, i.e., the existence of an attorney-client relationship, and the exchange of a confidential communication (*id.,* 670 N.E.2d at 1266).

IAA's Motion does not even attempt to carry its burden which has shifted to IAA to show that the communications are not protected because the confidentiality was waived or otherwise nullified. *Bassett,* 895 N.E.2d at 1206.

IAA should not be allowed to artificially create a need for production or an *in camera* inspection of hundreds of documents simply by stripping out descriptive information from Travelers' privilege logs to suit IAA's arguments – which are nevertheless undercut by the fact that IAA has withheld the identical types of documents on the same asserted grounds -- or simply

---

[10] These redacted entries can be submitted to the Court *in camera*, should the Court desire to see the substance of the redactions.

because IAA refuses to accept Travelers' adequately described basis for assertion of the attorney-client privilege. However, since IAA asserts the same grounds for attorney-client privilege to even more broadly described types or categories of documents, to the extent that this court grants IAA's request that Travelers should be required to produce these documents, IAA should likewise be required to produce the same types and categories of documents, based on the even more supportable argument that IAA's counsel were not acting as attorneys but merely as claims handlers for IAA.

**C.**   **Travelers Has Properly Redacted And Withheld Documents On The Basis Of Work-Product Prior To The Issuance Of Travelers' Claim Decision On July 13, 2013 Where Considerable Evidence Exists that Both Travelers and IAA Anticipated Litigation in January 2007**

Unlike the attorney-client privilege, application of the work product rule in federal courts is governed by federal, not state, law. *Harper v. Auto-Owners Ins. Co.,* 138 F.R.D. 655, 658 (S.D. Ind. 1991)(citing *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). Under Fed.R.Civ.P. 26(b)(3) the work product doctrine, codified therein, protects from disclosure (1) documents and tangible things (2) prepared in anticipation of litigation or for trial (3) by or for a party or its representatives, including the other party's attorney, consultant, surety, indemnitor, insurer, or agent.

Documents are considered to be prepared "in anticipation of litigation" for purposes of Rule 26(b)(3) where the "'primary motivating purpose behind the creation of a document or investigative report [is] to aid in possible litigation.'" *Binks Mfg. Co. v. National Presto Industries, Inc.,* 709 F.2d 1109, 1118 (7th Cir.1983). *Stout v. Illinois Farmers Ins. Co.,* 852 F.Supp. 704, 706 (S.D.Ind.1994). In determining when an insurer reasonably anticipates

18

litigation, courts must "avoid bright line rules and examine the specific facts of the case." *Goodyear Tire and Rubber*, 190 F.R.D. 532, 535-536 (S.D.Ind.1999).

As argued by IAA and as acknowledged by this Court in *Cummins,* many courts do in fact use presumptions in first-party insurance cases to determine whether documents were primarily motivated by the prospect of litigation. The court in *Cummins* applied a presumption that that since the insureds in *Cummins* were claiming property losses exceeding several million dollars, and the flood sublimits at issue therein were central to the issue whether insurance would cover all of the insured's losses, "at that point, the Insurers (and Cummins) knew that their differences of opinion amounted to tens of millions of dollars-an amount of money parties are likely to litigate about." (*Id*.). The same presumption applies here.  Where IAA is claiming $16 Million dollars more for a claim on which Travelers believes it only owes – and has already paid -- $4 Million dollars, this is an amount the parties were likely to litigate about.

The *Cummins* court also noted that while they were "still in the process of investigation and adjustment," the insurers anticipated litigation when they issued a preliminary coverage position letter, which expressed the Insurers' view that certain sublimits applied (limiting coverage for property losses in two of its buildings to $50 million), and that a special deductible applied because the two buildings were within a flood zone (*id*. at 6). This Court further noted that while the letter "might not have been the Insurers' last word short of litigation regarding coverage issues," the letter expressed the insurers' initial and detailed view of the coverage issues "at the heart of the parties' disputes."

Travelers' asserts that it anticipated litigation from January 31, 2007, when it involved coverage counsel.  Travelers sent out its first coverage position letter (a ROR letter) on  February 6, 2007 (**Dkt. 68-13**, Pg ID #999-1000).  While IAA argues that Travelers' February 6, 2007

19

letter does not amount to a true reservation of rights letter (Br. at 5-6), this argument is undermined by the immediate February 9, 2007 response from Hunt-Smoot's Attorney Jose Pienknagura that reveals he recognized it as such and insisted that "Travelers should withdraw its reservation of rights" in the February 9, 2007 letter  (**Exhibit 4**).

IAA's Motion also conveniently omits any mention of the multiple, progressively more detailed, ROR letters sent by Travelers to IAA dated 2/6/07, 3/6/07, 4/23/07; 5/16/07, 1/28/09, and 3/27/09 (**Exhibit 7**) which provide Travelers' detailed view of the coverage issues at the heart of the parties' disputes.  As in *Cummins*, these letters clearly memorialize the numerous detailed coverage issues as the claim developed (and which, not coincidentally are the same issues that are still at issue in this matter). While any one of these letter "might not have been the Insurers' last word short of litigation regarding coverage issues," the letters expressed Travelers' initial and detailed view of the coverage issues "at the heart of the parties' disputes." *Cummins,* 2011 WL 1832813 at *6 (S.D. Ind. May 2, 2011).

Additionally, IAA's immediate retention of counsel also underscores IAA's own anticipation of litigation which is highlighted by the fact that IAA has actually withheld and redacted more documents than Travelers from 2007 through 2013 on the basis of the very same privileges. *See e.g.,* **Exhibit 1** and **Exhibit 8**).

Just last week, IAA has produced an e-mail chain including a redacted e-mail dated **January 24, 2007** between David Dawson (IAA's non-lawyer media person) and John Kish, (Executive Director of IAA)(**Exhibit 10**). While IAA has conveniently never produced a privilege log for this redaction, IAA's only conceivable basis for redacting the content of the January 24, 2007 e-mail is the work product doctrine, again underscoring IAA's early anticipation of litigation.

Perhaps the most compelling evidence of IAA's pre-2013 anticipation of litigation is its repeated requests between January 14, 2009 and July, 2013 for Travelers to toll the statute of limitations in the policy to extend the date on which IAA needed to commence suit against Travelers.[11]

In *FDIC, supra*, this court found that the existence of a tolling agreement was "**prima facie" evidence** that the parties anticipated litigation:

> F & D claims FDIC produced no evidence showing Integra's anticipated litigation prior to notifying F & D in December 2010 of its intention to terminate the tolling agreement. (Defendant's Brief 8 (citing Defendant's Exhibit 6)). ***The court disagrees and considers the existence of a tolling agreement prima facie evidence that the parties considered litigation to be much more than a "remote prospect" or "inchoate possibility*****,**" *Harper,* 138 F.R.D. at 659–60 (internal quotations omitted) on February 18, 2010. [*FDIC* at *4].

Therefore, the existence of IAA's and Travelers' multiple tolling agreements, dating back to January 14, 2009 amounts to "prima facie evidence that the parties considered litigation to be much more than a "remote prospect" or "inchoate possibility." *Harper; FDIC.*

IAA is also clearly unable to make the requisite showing that "it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). IAA's motion does not even attempt to carry its burden which has shifted to IAA to show that the communications are not protected by the work product doctrine, as stated in *FDIC, supra* at *2:

> Once the asserting party satisfies its burden of establishing that disputed material was prepared in anticipation of litigation, the burden shifts to the party requesting discovery to show (1) a substantial need of the materials to prepare his case and

---

[11] Page 3 of the **Commercial Inland Marine Conditions**, Form CM 00 01 (09/04), states that "No one may bring a legal action against us under this Coverage Part unless … (2) The action is brought within 2 years after you first have knowledge of the direct loss or damage." [*Id.* (Emphasis added)].

(2) the inability, without undue hardship, to obtain the substantial equivalent of the materials by other means. Fed. R. Civ. P. 26(b)(3)(ii) (numbering added); *Suson v. Zenith Radio Corp.,* 763 F.2d 304, 308 n. 2 (7th Cir.1985). [*Id.* at *2].

As noted in *Caremark, Inc. v. Affiliated Computer Services, Inc.*, 195 F.R.D. 610, 616; 47

Fed.R Serv.3d 1117 (N.D. Ill. 2000):

> Federal Rule of Civil Procedure 26(b)(3) divides work product into two categories: 1) "opinion" work product, which reflects or reveals a lawyer's mental processes; and 2) "ordinary" or "fact" work product. … In the fact work product context, the burden then shifts to the moving side to demonstrate a substantial need for the information, and that it would be exceedingly difficult to obtain the information any other way. *Logan,* 96 F.3d at 976; *Vardon Golf Co. v. BBMG Golf Ltd.,* 156 F.R.D. 641, 646 (N.D.Ill.1994).

> Opinion work product is even more scrupulously protected. *In re Grand Jury Proceedings,* 33 F.3d 342, 348 (4th Cir.1994). . . . Suffice to say immunity from discovery for opinion work product is absolute or nearly absolute. *Bio–Rad Laboratories, Inc. v. Pharmacia, Inc.,* 130 F.R.D. 116, 121 (N.D.Cal.1990). In those circuits that do allow discovery for these type of documents, a "compelling showing" is required to produce the documents. *Id.*

In *Caremark, supra,* the court noted that "[m]ost of the factual information sought is being provided in answers to interrogatories or depositions." In the present case, other than interrogatories, requests for production of documents and subpoenas to third parties,  IAA has not noticed any depositions or otherwise made any additional attempts to obtain the documentation by any other non-privileged means. Therefore IAA has not demonstrated a substantial need for the withheld and redacted documents that Travelers asserts are privileged, nor has IAA demonstrated that it would suffer any undue hardship in obtaining substantially the same information in some other way. As to the attorney's mental impressions, conclusions, opinions, or legal theories, IAA has not demonstrated a sufficient "compelling showing" showing that would justify the production of these documents.

**D.**   **Travelers' Attorney-Client And Work Product Communications On The Topic Of Subrogation Are Privileged[12]**

IAA mistakenly relies on *Compton v. Allstate Prop & Cas. Ins. Co.*, 278 F.R.D. 193, 198 (S.D. Ind. 2011), on reconsideration in part (January 25, 2012) in support of its argument that subrogation information is not protected by the attorney client privilege.   A careful reading of *Compton* shows that *Compton* determined that the privilege asserted regarding the subrogation information wasn't the attorney-client privilege, but rather the "insured-insurer" privilege:

> The court assumes Allstate is invoking the insured-insurer privilege recognized in *Richey v. Chappell*, 594 N.E.2d 443 (Ind.1992). *Richey* held that an insured's statement about the underlying event given to the insurer (which has a duty to defend its insured) and that is in the nature of a communication the insured would make for the purpose of obtaining legal advice, can be protected from discovery by the person suing the insured. The entries regarding the mortgagee in the NextGen report do not remotely fit these circumstances.
>
> The entries in the NextGen report regarding subrogation do not appear to have been made primarily because of the prospect of subrogation litigation, but appear to reflect a typical and ordinary evaluation of whether the insurer has any subrogation interest to pursue. [*Id*. at 9-10].

In *Cummins*, (*Cummins, Inc. v. Ace Am. Ins. Co.*, No. 1:09-CV-00738-JMS, 2011 WL 1832813 (S.D. Ind. May 2, 2011))(**Exhibit 11**), the same magistrate who rendered the Compton decision, concluded that the attorney-client privilege applied to bar disclosure of subrogation communications. In contrast to her decision in Compton, Magistrate McVicker Lynch concluded

---

[12] Travelers has recently discovered that a number of documents identified as containing subrogation *and* reserve information on Traveler's privilege log, actually contain only reserve information and some of the attorney-client communications contain no reference to subrogation (see e.g., TRV Bedard 000006, 9, 12, 14, 17, 20, 23, 26-27, 29, 31-33, 35-36, 38, 43, 45-46, 49, 52; TRV FISHER CLM 001807, 1810, 4923, 4927, 4930, 011717, 011754, 011757, 022419-022417, 022431-022437, 022472, 022489-022490, 022511, 022528-022544, 022944; TRV CLM 000404, 001357, 1360, 1363, 1366, 1370, 1377, 1379, 1388, 1391, 1393, 1394, 1399, 1402, 1402, 1409, 1412, 1415, 1419, 2015 and 2018). These documents should have been described as containing subrogation *and/or* reserve information.  The attorney-client communications are not discoverable on the basis of the preceding discussion and the authority regarding reserves discussed in the following section.

23

in *Cummins* that "communications with or from, or about communications with the insurer's outside counsel regarding subrogation issues" were nevertheless protected by the attorney-client privilege (*id.* at *4).

Moreover, contrary to the IAA's argument in the present Motion, IAA's counsel recently took the position that similar documentation "relating to separate legal matters" remains protected:

> Travelers' claims that Document Nos. 42, 46, 48-50, 55, and 58-64 are not protected because they relate to other "claims" that are relevant to the instant lawsuit is likewise without merit. Per your request, we have revised the Hunt/Smoot privilege log to reflect the "claim" at issue. But regardless of whether the claim relates to the Steel Incident or not, the above documents remain protected by the applicable privileges. *See, e.g, Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.,* 190 F.R.D. 532, 538 (S.D. Ind. 1999) ("If a document is protected by the work product privilege, it is protected in any litigation, not only in the litigation for which the document was prepared.") (citing numerous cases); *Sandra TE. v. South Berwyn School Dist. 100,* 600 F .3d 612, 621 (7th Cir. 2009) ("the attorney-client privilege protects not only the attorney-client relationship in imminent or ongoing litigation but also the broader attorney-client relationship outside the litigation context"). [**Exhibit 8**, Ice Miller's July 23, 2014 letter to Chapnick]

IAA's own rationale provides yet another basis to support the privileged nature of the subrogation information that Travelers has withheld as subrogation is a separate legal matter than the coverage case. Travelers' subrogation investigation was specifically performed in anticipation of future litigation. Travelers hired outside counsel to offer legal opinions and advice relating to Travelers' anticipation of future litigation.  Accordingly, such communications are specifically protected by the attorney-client and work product privileges recognized in Indiana and elsewhere.  *See Cummins, Inc. v. ACE American Insurance Co.*, 2011 WL 1832813 (S.D. Ind. 2011); *Bartlett v. State Farm Mutual Automobile Insurance Co.*, 206 F.R.D. 623 (S.D. Ind.

24

2002); *The Hartford Financial Services Group, Inc. v. Lake County Park and Recreation Board*, 717 N.E.2d 1232 (Ind. Ct. App. 1999).

Even if IAA could overcome the attorney-client privileged nature of the subrogation communications that have been redacted, IAA has failed to demonstrate any relevance to the communications in any event.  Fed. R. Civ. P. 26(b)(1) provides that the scope of discovery is limited to matters relevant to any party's claim or defense

The 2000 Advisory Committee Notes to subrule (b)(1) states that this language "signals to the court that it has the authority to confine discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings."[13]

Not only were entirely separate Travelers claims handlers[14] and different counsel involved in the consideration of the legal issues involved with the anticipated pursuit of subrogation, but the subrogation issues and facts relevant thereto were considered and analyzed separately as well.  The facts and issues analyzed and considered for subrogation have no bearing on any of the coverage issues before this Court.  Simply put, IAA cannot meet the "good cause" standard of Fed. R. Civ. P. 26(b)(1)(see *In re Cooper, supra*) to show that the issues Travelers considered relating to subrogation have any bearing whatsoever to this declaratory judgment and

---

[13] As noted in *In re Cooper Tire & Rubber Co.*, 568 F.3d. 1180, 1188-89 (C.A. 10 2009), the language of the 2000 amendment to subrule (b)(1) to "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party...." (previously the available scope of discovery was that which was relevant to the *subject matter* of the action)..
…Accordingly, when a party objects that discovery goes beyond that relevant to the claims or defenses, "the court would become involved to determine whether the discovery is relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so long as it is relevant to the subject matter of the action." Fed.R.Civ.P. 26 advisory committee's note (2000).
[14] (Separate Subrogation Adjusters, see **Exhibit 3**, TRV CLM 000437 Terry Darling; TRV CLM 000431 Jay Davenport, TRV CLM 000399 Mary Ellen Buta; and separate Counsel, TRV CLM 000431, 422,  Kevin Caraher with Cozen & O'Connor).

breach of contract matter. Accordingly, none of the subrogation information is reasonably calculated to lead to the discovery of admissible evidence. IAA has failed to show how and why any subrogation communications have any relevance or could lead to the discovery of admissible evidence under the circumstances of this case.

**E.** **The Dollar Amounts Of Travelers' Reserves Are Neither Relevant Nor Discoverable Under The Law Of This District**

Finally, Plaintiff seeks discovery of insurance reserves set on each claim file which is mandated by insurance regulators. Indiana law is clear that, outside of bad-faith claims, reserve information is generally not discoverable. As stated in *In re AT&T Fiber Optic Cable Installation Litig,* No. IP99-C9313HK, 2002 WL 1364157 at *2 (S.D. Ind. June 5, 2002), "The fact that…knowledge of a defendant's or insurer's litigation reserves for a case would also be helpful to plaintiffs in many cases [to formulate a strategy for settlement negotiations], but such information is ordinarily not discoverable. See, *e.g., Harper v. Auto Owners Ins. Co.,* 138 F.R.D. 655, 675 (S.D.Ind.1991) (ordering that while insurer was required to produce internal memorandum regarding details of fire and loss prepared in the ordinary course of the claim evaluation. "[t]he section on the reserve established shall be redacted.")

IC 27-1-13-8(c) requires an insurance company to set reserve amounts on any insurance claim made by an insured. As such, Indiana courts and courts around the country have consistently found that in cases where the insured has not alleged bad faith, reserve information is not relevant and therefore in most instances is not discoverable.[15] Even the judges in this

---

[15] Numerous courts have recognized the amount posted as a reserve is not reasonably calculated to lead to the discovery of admissible evidence concerning insurance policy interpretation and there is a "tenuous link between reserves and actual liability given that numerous considerations factor into complying with this statutory directive." *See e.g., Fidelity Deposit Company of Maryland v. McCulloch*, 168 F.R.D. 516 (E.D.Pa. 1996); *Independent Petrochemical*

district have found no relevance to reserve amounts outside of the bad faith context.  See, e.g.,

*National Union Fire Insurance Co. of Pittsburgh, Pa v. Mead Johnson & Co.*, 2011 WL

5025494 at *3 (S.D. Ind. 2011), objections sustained in part on other grounds, 2014 WL 931947

(March 10, 2014) (holding that reserve information is not relevant to the claim):

> …loss reserves by an insurance company are largely based on regulatory criteria and do not represent the company's own evaluation of liability. That is to say, an insurer who has the potential to pay a liability may be required to reserve a substantial amount for that liability, even though the company concludes that there is a significant chance that the liability will not be incurred. The Magistrate Judge concludes that reserve information is not relevant to this claim and sustains the objection to information concerning reserves. [*Id.* at *3].

*Woodruff v. American Family Mut. Ins. Co.*, 291 F.R.D. 239, 250 (S.D. Ind. 2013) (reserve

information only relevant on the issue of good faith); *Kleinrichert v. American Family Ins.

Group*, 2011 WL 470614 *4 (S.D. Ind. 2011)(reserve information was irrelevant "[b]ecause of

the business risk and regulatory compliance considerations involved in the setting of loss

reserves…"); *Schierenberg v. Howell-Baldwin*, 571 N.E.2d 335, 337 (Ind.Ct.App. 1991) *rev'd

on other grounds* (holding the amount of reserves were properly redacted and protected from

discovery).

The instant matter does not involve any bad faith claim.  The only issue before this Court

is whether coverage exists for the remaining amounts for which IAA seeks coverage under

Travelers' policy. Therefore IAA's reliance on *Cummins, Inc. v. Ace Am. Ins. Co.*, No. 1:09-CV-

00738-JMS, 2011 WL 130158 (S.D. Ind. January 14, 2011) and *Auto-Owners Ins. Co. v. C & J

Real Estate, Inc.*, 996 N.E2d 803, 807 (Ind. Ct. App. 2013) is misplaced because both cases

involved claims for bad faith.

---

*Corporation v. Aetna*, 117 F.R.D. 283 (D.D.C. 1986); *Couch III v. Equity General Insurance*, 80 B.R. 512 (S.D.Cal. 1987); *Rhone-Poulenc Rorer Inc. v. Home Indem. Co.,* 139 F.R.D. 609, 613-14 (E.D. Pa. 1991), on reconsideration in part 24 Fed.R.Serv.3d 762 (1991).

27

Similarly, the *Auto–Owners* case cited by IAA, unlike the present case, also involved claims for bad faith, and breach of the insurer's duty of good faith and fair dealing, in addition to a breach of contract claim (*id*. at 804). The court in *Auto-Owners* declined to follow the holding in *Schierenberg* that information regarding insurance reserves was not discoverable because it was "not reasonably calculated to lead to the discovery of admissible evidence" specifically because *Schierenberg* did not involve a claim for bad faith (*id.* at 338).

Consistent with these decisions, the limited reserve information redacted simply has no bearing on any of the coverage issues involved in this case or Travelers' defenses. (See also *Coltec Indus, Inc. v. Am Motorists Ins. Co.*, 197 F.R.D. 368, 372 (N.D. Ill. 2000)("Generally, courts have refused to order production of such [reserves] material (citing *Leksi, Inc. v. Federal Insurance Co.,* 129 F.R.D. 99, 106 (D.N.J.1989); *Independent Petrochemical, supra*). Nevertheless, IAA attempts to raise a novel relevance argument claiming that the precise amount of the reserves that Travelers set are relevant to establish Travelers' understanding of the loss and resulting damages.

This argument represents a serious misunderstanding of the purpose and meaning of reserves, as determined by numerous courts.  Reserves are regulatory requirements to estimate the maximum potential liability on a claim. *National Union, supra*.  As noted by another district court within the 7th Circuit, *Barr Co. v. Safeco Ins. Co. of Am.*, No. 83 C 2711, 1988 WL 64558 (N.D. Ill. June 15, 1988):

> The calculation of insurance reserves is ***an accounting technique by which insurance companies estimate the maximum potential liability on a claim***. ***This calculation has no bearing on the adjustment of claims*** and is not germane to Barr's complaint. Further, we believe that ***the admission of these computations into evidence would only tend to mislead the jury by giving it a false idea of the dollar amount that Safeco thinks is its total exposure for loss and litigation expenses***. [(emphasis added)].

28

*See also Indep. Petrochemical*, *supra*, 117 FRD at 288 (…a reserve essentially reflects an assessment of the value of a claim taking into consideration the likelihood of an adverse judgment and that such estimates of potential liability do not normally entail an evaluation of coverage based upon a thorough factual and legal consideration when routinely made as a claim analysis. . . ), *Rhone-Poulenc, supra* (same); *Natl Union Fire Ins. Co. of Pittsburgh, Pa v. Stauffer Chem Co.*, 558 A.2d 1091, 1097-98 (Del. Super 1989)("...the decision of the insurers to establish reserves is not closely connected with the interpretations of the policies in regard to the claims…because the reserves are only estimates.); *Fed. Realty Inv. Trust v. Pac. Ins. Co.*, 760 F. Supp. 533, 540 (D. Md. 1991)("*reserve decisions are mere guesses* …"); *Hoechst Celanese Corp. v. Natl Union Fire Ins. Co. of Pittsburgh, Pennsylvania*, 623 A.2d 1099, 1109-10 (Del. Super 1991)("Reserves are accounting entries which an insurance company regularly uses to set aside sufficient funds in the event of policyholder liability.").

In this case, where IAA has not alleged a bad faith claim, any discussions regarding reserve information and/or actual reserve amounts is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence in regards to IAA's breach of contract action against Travelers. Accordingly, where reserves are not relevant to any issue of coverage such information was properly redacted.

**F.    IAA's Request That The Court Make Its Privilege Determination Based Only On A Review Of A Few Documents Is Incorrect.  The Court's Privilege Determination Must Be Made Based On An *In Camera* Review Of All Documents And Only Released After The Court Determines That Each Such Document Is Not Privileged**

Finally, IAA suggests that this Court should determine whether to disclose numerous of documents or entries containing privileged communications by merely reviewing a sample of documents IAA has selected. While the discoverability of documents dealing with reserves may

possibly be determined by viewing a few representative samples of such documents, such a random review of documents over which Travelers has asserted the attorney-client privilege and work product doctrine would not comply with the provisions of Fed. R. Civ. P. 26.

Fed. R. Civ. P. 26(b)(3)(B) embodies the work product doctrine.  That Rule mandates that the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Each of the documents withheld or redacted by Travelers is unique and there are different reasons for the privileges asserted as outlined on Travelers' Privilege Log and in the context of this lengthy complex claim.  A review of a representative sampling of documents "cherry picked" by IAA does not address the unique circumstances of each document, nor does it provide the protection required by Rule 26.  Accordingly, Travelers rejects IAA's suggestion of production of hundreds of documents based on IAA's proposed limited review.

## IV.   CONCLUSION

IAA has failed to meet its burden on proof to show that any additional production of documents is warranted by Travelers and Travelers has adequately demonstrated that it has properly withheld or redacted the documents at issue based on the attorney-client and work product privileges.  Therefore, Travelers respectfully requests that this Court deny IAA's Motion to Compel.  However, if any question is presented by the documents that Travelers has redacted or withheld, Travelers requests that this Court perform an *in camera* review of those documents before releasing any such documents.

Respectfully submitted,

/s/ Michele A. Chapnick
Michele A. Chapnick, P48716
GREGORY AND MEYER, P.C.
340 E. Big Beaver Rd., Suite 520
Troy, MI 48083
Telephone: (248)689-3920
Facsimile: (248)689-4560
mchapnick@gregorylaw.com

Dated: September 29, 2014

/s/ Rick L. Hammond
Rick L. Hammond, #19044-45
Samuel R. Stalker, #6300938
Stephen M. Brandenburg, #28935-45
JOHNSON & BELL, LTD.
33 W. Monroe St., Suite 2700
Chicago, IL 60603
Telephone: (312)372-0770
Facsimile: (312)372-9818
hammondr@jbltd.com
stalkers@jbltd.com
brandenburgs@jbltd.com

*Attorneys for Defendant Travelers Property
Casualty Company of America*

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2014, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Rebecca Seamands (#16505-49)
Jenny R. Buchheit (#26653-49A)
Nathaniel M. Uhl (#25139-49)
**Ice Miller, LLP**
Rebecca.seamands@icemiller.com
jenny.buchheit@icemiller.com
nate.uhl@icemiller.com
Attorneys for Plaintiff

/s/ Michele A. Chapnick
MICHELE A. CHAPNICK
GREGORY AND MEYER, P.C.
Attorneys for Defendant Travelers
340 E. Big Beaver, Ste. 520
Troy, MI 48083
(248) 689-3920
P48716
mchapnick@gregorylaw.com