UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANAPOLIS AIRPORT AUTHORITY, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | No. 1:13-cv-01316-JMS-MPB |
| | ) | |
| TRAVELERS PROPERTY CASUALTY COMPANY OF | ) | |
| AMERICA, | ) | |
| | ) | |
| *Defendant*. | ) | |

## ORDER

Presently pending before the Court in this insurance coverage case is Plaintiff Indianapolis

Airport Authority's ("IAA") Motion for Partial Summary Judgment, [Filing No. 222], and De-

fendant Travelers Property Casualty Company of America's ("Travelers") Cross Motion for Sum-

mary Judgment, [Filing No. 238].[1]

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because

there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear,

whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the

asserted fact by citing to particular parts of the record, including depositions, documents, or affi-

davits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials

---

[1] Also pending is IAA's Motion for Oral Argument, [Filing No. 249].  The parties' briefs afforded
the Court an adequate basis on which to rule on the pending summary judgment motions without
the assistance of oral argument.  The Court, therefore, denies IAA's Motion for Oral Argument,
[Filing No. 249].

- 1 -

cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. Hampton v. Ford Motor Co., 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. Harper v. Vigilant Ins. Co., 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed. 202 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. Johnson v. Cambridge Indus., 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. Nelson v. Miller, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. Darst v. Interstate Brands Corp., 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. O'Leary v. Accretive Health, Inc., 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P.

56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the existence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact."  *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003).  Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial."  *Id.* at 648.

## II.
### GENERALLY APPLICABLE INSURANCE LAW

When the Court exercises diversity jurisdiction over an action, it is "obliged to apply state law to the substantive issues in the case."  *Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635, 639 (7th Cir. 2015) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  The parties do not dispute that Indiana law governs this action.  Accordingly, this Court must "apply the law that would be applied by the Indiana Supreme Court."  *Lodholtz*, 778 F.3d at 639.  "If the Indiana Supreme Court has not spoken on the issue, [the Court] generally treat[s] decisions by the state's intermediate appellate courts as authoritative, unless there is a compelling reason to think that the state supreme court would decide the issue differently."  *Id.*

The Indiana Supreme Court has summarized the well-established standards for interpreting insurance policies in Indiana as follows:

Interpretation of an insurance policy presents a question of law that is particularly suitable for summary judgment. It is well settled that where there is ambiguity, insurance policies are to be construed strictly against the insurer and the policy language is viewed from the standpoint of the insured. This is especially true where the language in question purports to exclude coverage. Insurers are free to limit the coverage of their policies, but such limitations must be clearly expressed to be enforceable. Where provisions limiting coverage are not clearly and plainly expressed, the policy will be construed most favorably to the insured, to further the policy's basic purpose of indemnity. Where ambiguity exists not because of extrinsic facts but by reason of the language used, the ambiguous terms will be construed in favor of the insured for purposes of summary judgment.

*State Auto. Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 848 (Ind. 2012) (citations and quotations omitted).

The Court will "construe the insurance policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases, or paragraphs." *West Bend Mut. Ins. Co. v. U.S. Fid. & Guar. Co.*, 598 F.3d 918, 921 (7th Cir. 2010) (applying Indiana law). Words are given their ordinary meaning, though where ambiguity exists the policy is read "strictly against the insurer." *Id.* Ambiguous language in the policy is resolved in favor of the insured as long as such an interpretation harmonizes the provisions of the contract as a whole. *Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 578 (Ind. 2013). Failure to define a term in the policy "does not necessarily make that term ambiguous, nor does a simple disagreement about the term's meaning." *Id.* (citation omitted). "Rather, an ambiguity exists where the provision is susceptible to more than one reasonable interpretation." *Id.* (citation and quotation omitted). Where the terms of an insurance policy are clear and unambiguous, the Court "will apply the plain and ordinary meaning of the terms and enforce the contract according to its terms…. [T]he parties' intent is to be determined by reviewing the language contained within the 'four corners' of the contract, and 'parol or extrinsic evidence is inadmissible to expand, vary, or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, illegality, duress or undue influence.'

Extrinsic evidence cannot be used to create an ambiguity." *Bar Plan Mut. Ins. Co. v. Likes Law Office, LLC*, 44 N.E.3d 1279, 1285 (Ind. Ct. App. 2015) (citations omitted).

### III.
### STATEMENT OF FACTS

In connection with the pending cross motions for summary judgment, the parties have filed over 170 pages in briefs, and over 2,000 pages in exhibits.  This has made the Court's review of the motions extremely cumbersome.[2]  As will be discussed below, however, the Court finds the insurance provisions at issue in this case to be unambiguous.  Therefore, the majority of the exhibits submitted and discussed by the parties do not bear on the issues raised in the cross motions, and the Court will only discuss facts relevant to its decision.

The Court finds the following to be the relevant undisputed facts, as supported by proper citation to admissible evidence in the record and viewed in the light most favorable to IAA:

### A.  The Policy

This case relates to insurance coverage for an incident that occurred during construction of the New Midfield Terminal Project (the "Project"), a project owned by IAA which involved construction at the Indianapolis International Airport.  [Filing No. 35 at 2.]  In 2005, IAA and Travelers began discussing the possibility of IAA purchasing a Travelers policy to cover certain aspects of the Project.  [*See, e.g.*, Filing No. 225.]  When negotiations concluded, IAA purchased a Commercial Inland Marine Insurance Policy from Travelers which was written on Travelers' then-standard "Inland Marine" or "IM PAK" form.  [Filing No. 222-2 at 29-30; Filing No. 222-3 at 3.]  The

---

[2] The Court is reminded of Mark Twain's famous quote:  "I didn't have time to write a short letter, so I wrote a long one instead."  http://thinkexist.com/ (last visited April 12, 2016).  A similar quotation is also attributed to Blaise Pascal, a French mathematician, logician, physicist, and theologian, who said "I would have written a shorter letter, but I did not have the time."  https://en.wikiquote.org/wiki/Blaise_Pascal (last visited April 12, 2016).

policy relevant to this lawsuit covered the period May 20, 2006 to May 20, 2007 (the "Policy"). [Filing No. 222-3 at 10.] Specifically, the Policy provided certain "Builders' Risk" coverage to "ALL PHASES PER SCHEDULE ON FILE WITH US OF NEW MIDFIELD TERMINAL PRO-JECT AT THE INDIANAPOLIS INTERNATIONAL AIRPORT." [Filing No. 222-3 at 10.][3]

### B. The Shoring Tower Incident

During construction of the Project, two temporary shoring towers were being used to lift steel trusses into place so that they could be installed as part of the high roof structure.   [Filing No. 222-6 at 2.]  On January 24, 2007 the shoring towers failed, causing the portion of the roof structure that was being built to drop a foot or more and land on already-installed structural framing below (the "Shoring Tower Incident").  [Filing No. 222-6 at 2; Filing No. 222-7 at 6.]  Immediately following the Shoring Tower Incident, construction on the Project ceased and the damaged struc-ture was evaluated to determine the scope and impact of the Shoring Tower Incident, the scope and plan for work needed to repair damage, and the means and methods required to accomplish those repairs.  [Filing No. 222-6 at 3; Filing No. 222-9 at 6-7.]

Prior to the Shoring Tower Incident, the Project was scheduled to be substantially com-pleted by July 24, 2008, with opening day scheduled for September 28, 2008.  [Filing No. 222-6 at 3; Filing No. 222-8 at 6-7.]  The Project ended up opening for business on November 11, 2008. [Filing No. 222-6 at 3.]

---

[3] IAA and Travelers have identified numerous Policy provisions that they contend are relevant to the resolution of the issues in this lawsuit.  The Court will discuss specific Policy provisions as necessary in the "Discussion" section.

### C.  Travelers' Payments Under the Policy

After the Shoring Tower Incident, IAA submitted a Sworn Statement in Proof of Loss ("SSPOL"), which detailed $12,815,157 in loss that IAA claimed was covered by the Policy.  [Filing No. 238-27 at 5.]  After considering IAA's claim, Travelers made the following payments under the Policy:

- $4,194,357 for costs to inspect the physical damage and restore the damaged property to the condition immediately before the loss, [Filing No. 238-15 at 15; Filing No. 238-16 at 5-6; Filing No. 238-17 at 17; Filing No. 238-17 at 23; Filing No. 238-18 at 4]; and

- $100,000 for "Expediting Costs and Additional Cost of Construction Materials and Labor," [Filing No. 238-15 at 20-21; Filing No. 238-16 at 11; Filing No. 238-17 at 17; Filing No. 238-17 at 23; Filing No. 238-18 at 4].

### D.  The Lawsuit

IAA initiated this lawsuit against Travelers on August 19, 2013, [Filing No. 1], and filed the operative Second Amended Complaint on February 27, 2014, [Filing No. 35].  IAA seeks a declaration that the Policy provides coverage for, in addition to direct physical loss, the following:

- "[T]he costs of resequencing and accelerating the course of construction on the Project; the costs incurred in investigating and inspecting the existing construction in order to assess the areas impacted and the repairs needed to address the [Shoring Tower Incident]; the costs of extending the time contractors and consultants were on the Project; the costs to resolve change orders and claims asserted by contractors and consultants because their work on the Project was impacted by the [Shoring Tower Incident]; and overtime expenses to minimize delays," [Filing No. 35 at 6];

- Certain "Expenses to Reduce Amount of Loss," including but not limited to "the cost of resequencing and accelerating the course of construction on the Project; the costs of extending the time contractors and consultants were on the Project, so that demobilization and remobilization costs were avoided, and the risk of contractors not returning to the Project was minimized; the costs to resolve change orders and claims asserted by contracts and consultants because their work on the Project was to be performed differently than originally planned, so as to progress the work as quickly as possible under the new circumstances caused by the [Shoring Tower Incident]; and overtime expenses to minimize delays," [Filing No. 35 at 6-7]; and

- "Soft costs," including bond interest, "during the period beginning 90 days after the planned completion date and ending on the date when the Project would have been completed using reasonable speed and similar materials and workmanship," [Filing No. 35 at 7].

IAA also asserts a breach of contract claim. [Filing No. 35 at 7.]

IAA filed its Motion for Partial Summary Judgment on November 16, 2015, in which it asks the Court to make the declarations it requests in its Second Amended Complaint. [*See* Filing No. 259 at 35-36.] On December 17, 2015, Travelers filed its Cross Motion for Summary Judgment, and asks the Court to declare that no coverage exists for any of the remaining amounts IAA seeks under the Policy. [*See* Filing No. 240 at 62.] The Court will now consider the cross motions.

## IV.
### DISCUSSION

This case involves a dispute over the interpretation of three Policy provisions, and the validity of one of Travelers' affirmative defenses. Specifically, IAA and Travelers disagree regarding: (1) the scope of the Policy's General Coverage Provision; (2) whether the Policy provides coverage for "soft costs"; (3) the extent of coverage provided by the Expense to Reduce "Amount of Loss" provision (the "ERAL Provision"); and (4) whether Travelers' affirmative defense related to circumstances, accidents, losses, occurrences, or damages that took place outside of the Policy period is valid. The Court will address each issue in turn.

### A. The General Coverage Provision

The Policy's General Coverage Provision states:

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

#### 1. Covered Property

Covered Property, as used in the Coverage Part, means "Builders' Risk".

#### 2. Covered Causes of Loss

- 8 -

> Covered Causes of Loss means RISKS OF DIRECT PHYSICAL "LOSS" except those causes of "loss" listed in the Exclusions.

[Filing No. 222-3 at 14.]  The Policy defines "Builders' Risk" as:

> Property described in the Declarations under "Builders' Risk" owned by you or for which you are legally liable consisting of:
>
> a.  Buildings or structures including temporary structures while being constructed, erected or fabricated at the "job site";
>
> b.  Property that will become a permanent part of the buildings or structures at the "job site":
>
>> (1) While in transit to the "job site" or temporary storage location;
>>
>> (2) While at the "job site" or at a temporary storage location.

[Filing No. 222-3 at 24.]  "Builders' Risk" is defined in the Declarations as "ALL PHASES PER SCHEDULE ON FILE WITH US OF NEW MIDFIELD TERMINAL PROJECT AT THE INDIANAPOLIS INTERNATIONAL AIRPORT."  [Filing No. 222-3 at 10.]  "Loss" is defined as "accidental loss or damage."  [Filing No. 222-3 at 26.]

IAA argues that the Policy's General Coverage Provision covers more than just direct physical damage.  It asserts that the clause "direct physical loss or damage" refers to the types of risks of causation that trigger coverage, so that all damage caused by "direct physical loss or damage" is covered.  [Filing No. 259 at 14-16.]  Accordingly, IAA argues, the Policy provides coverage for any accidental loss or damage to the Project, not just physical damage caused to a structure from the Shoring Tower Incident.  [Filing No. 259 at 16-17.]  IAA points to the following types of damages that it argues are covered by the General Coverage Provision: "(a) the costs of extending the time contractors and consultants were on the Project, due to the Shoring Tower Incident; (b) the costs of claims asserted by contractors and consultants because their work on the Project was

impacted by the Shoring Tower Incident; (c) costs to investigate and inspect the structure to determine the scope of damage and the plan for repair; and (d) overtime expenses and costs to accelerate the work to minimize delays caused by the Shoring Tower Incident." [Filing No. 259 at 18.] IAA claims that these are losses to Covered Property, so are encompassed in the General Coverage Provision. [Filing No. 259 at 18.] IAA also asserts that the Expediting Costs Provision is simply an additional coverage, and not a limitation on the General Coverage Provision. [Filing No. 259 at 19-23.]

Travelers' position is that the General Coverage Provision only covers damage to a building or structure. [Filing No. 240 at 29.] It points to the Policy Declarations, which state that "Builders' Risk" "cover[s] only the buildings and structures shown below," and then refers to all phases of the Project in the "Location, Description and Coinsurance Percentage" section of the Declarations. [Filing No. 240 at 30-31.] Travelers also relies upon the Valuation Provision in the Policy, which it argues limits Travelers' obligation to paying for the cost of reasonably restoring the damaged building to its condition immediately before the Shoring Tower Incident. [Filing No. 240 at 31-32.] Travelers also notes that the Policy specifically excludes loss resulting from delay, loss of use, or loss of market, and the only coverage for such loss would be under the Policy's "Additional Coverages," such as the Expediting Costs Provision of the Policy. [Filing No. 240 at 32.] Travelers points to two sections of the Policy – "Coverage Extensions" and "Additional Coverages" – and argues that "[i]f, as IAA argues, all of its economic and consequential costs are covered by the 'General Coverage Provision' because they are a 'loss' under the Insuring Clause, then there would be no need for the Coverage Extensions and Additional Coverages and those provisions would be rendered superfluous." [Filing No. 240 at 35.]

- 10 -

### 1. The General Coverage Provision is Unambiguous

IAA states that "[a]lthough it is IAA's position that the Policy unambiguously provides coverage, if the Court disagrees, it should find that the provision is ambiguous, and thus, construe it against Travelers and in favor of IAA." [Filing No. 259 at 19.] But, tellingly, IAA does not point to any specific phrases that it argues are ambiguous.

The Court finds that the General Coverage Provision is not ambiguous. It provides coverage for "loss" (defined as accidental loss or damage) to Builders' Risk, which is defined in the Declarations as "the buildings and structures shown below" (including "all phases per schedule on file with us of New Midfield Terminal Project at the Indianapolis International Airport"). [Filing No. 222-3 at 10; Filing No. 222-3 at 14; Filing No. 222-3 at 26.] IAA ignores the Declaration's explicit limitation of "Builders' Risk" to coverage for "the buildings and structures shown below." [See Filing No. 222-3 at 10.] But the Court must give effect to each phrase in the Policy, and cannot simply ignore this limitation. See State Farm Fire and Cas. Co. v. Bayer, 1991 WL 354383, *3 (S.D. Ind. 1991) ("A court should find an intent which gives effect to each clause in [an insurance policy]").

Additionally, "loss" is specifically defined as "accidental loss or damage." [Filing No. 222-3 at 26.] The amounts which IAA argues are covered under the General Coverage Provision were not "accidental," but rather followed from accidental loss. Those amounts are addressed elsewhere in the Policy, but not in the General Coverage Provision. [See, e.g., Filing No. 222-3 at 17 (Expediting Costs Provision covers certain "costs to expedite repair of Covered Property" and "costs to make changes in construction specifications").] The General Coverage Provision is limited to direct accidental physical loss or damage to the building under construction. See One Place Condominium, LLC v. Travelers Property Cas. Co. of America, 2015 WL 2226202, *3 (N.D. Ill.

2015) (Travelers' Builders Risk policy with identical general coverage provision "pays for accidental direct physical loss of or damage to the Property").

This plain reading of the General Coverage Provision also comports with other provisions of the Policy, which the Court must read as a whole. *See West Bend Mut. Ins. Co. v. U.S. Fid. & Guar. Co.*, 598 F.3d 918, 921 (7th Cir. 2010) (applying Indiana law). The Valuation Provision, which is under a section titled "Additional Coverage Conditions," provides that the value of Covered Property is the least of several options – in this case, it is "[t]he cost of reasonably restoring that property to its condition immediately before 'loss.'" [Filing No. 222-3 at 22.] Significantly, this is measured "as of the time of 'loss'," [Filing No. 222-3 at 22], which, as Travelers points out, could only include physical damage to "buildings [or] structures." Other losses of the type IAA seeks coverage for – such as the costs of claims asserted by contractors and consultants because their work on the Project was impacted by the Shoring Tower Incident, or overtime expenses related to accelerating the work to minimize delays caused by the Shoring Tower Incident – did not exist at the time of the loss, and are not addressed in the Valuation Provision. The Valuation Provision's narrow wording, limiting the value of Covered Property to the time of loss and measuring it as the cost of reasonably restoring the property to its condition immediately before loss, is

consistent with the General Coverage Provision's limitation of coverage for direct physical damage only.[4]  *See One Place*, 2015 WL 2226202 at *10 ("Since a builder's risk policy is designed to insure against loss or damage to property undergoing construction, there is no point in explaining how to determine the monetary value of damaged property [in the Valuation Provision] unless that value then translates into a payment obligation").

The plain meaning of the General Coverage Provision also fits together with the "Additional Coverages" and "Coverage Extensions" sections of the Policy.  The Policy specifically excludes "'loss' caused by or resulting from…[d]elay, loss of use or loss of market."  [Filing No. 222-3 at 19.]  Then, under "Additional Coverages," the Policy adds limited coverage for certain costs – for example, "Expediting Costs and Additional Cost of Construction Materials and Labor" (the "Expediting Costs Provision").  [Filing No. 222-3 at 17.]  The Court notes that if costs that could be considered expediting costs and additional costs of construction materials and labor were covered by the General Coverage Provision, it would not be necessary to have the Expediting Costs Provision as an "Additional Coverage."  The Expediting Costs Provision would be superfluous, a result which would not comport with Indiana law.  *See State Farm Fire and Cas. Co. v. Bayer*, 1991 WL 354383, *3 (S.D. Ind. 1991); *see also Oceanside Pier View, L.P. v. Travelers*

---

[4] IAA argues that the Policy does not limit Travelers' obligation to paying an amount determined by the Valuation Condition.  [Filing No. 247 at 24.]  But the Valuation Provision appears in a section of the Policy titled "Additional Coverage Conditions" and limits the value of loss to Covered Property to, in this case at least, "[t]he cost of reasonably restoring that property to its condition immediately before 'loss.'"  [Filing No. 222-3 at 21-22.]  IAA also contends that such a limitation would be inconsistent with the ERAL Provision and coverage for soft costs, because those amounts are covered but do not "pay for costs to restore the property to its pre-loss condition."  [Filing No. 247 at 24.]  IAA ignores the fact, however, that the ERAL Provision is listed as an "Additional Coverage," separate and apart from amounts covered by the General Coverage Provision.  Similarly, "soft costs" are specifically addressed and defined as resulting from loss to Covered Property from Covered Causes of Loss which delay the completion of the Project beyond the planned completion date.  If they were covered by the General Coverage Provision as a "loss" to Covered Property, there would be no need to separately address and define them.

*Property Cas. Co. of America*, 2008 WL 7822214, *8 (S.D. Cal. 2008) (holding that identical Expediting Costs Provision in Travelers' Builders' Risk policy indicated that general coverage provision did not cover increased costs to construction materials and labor for previously un-constructed portions of the Project, because that would "render the 'Additional Coverage' provision for 'Expediting Costs…' superfluous, ambiguous, and with respect to the latter provision's $100,000.00 limitation, meaningless").  The Court rejects IAA's argument that its expediting costs are covered under the General Coverage Provision, and that the Expediting Costs Provision simply provides an additional $100,000 of coverage once the Policy's $787,300,000 limit is exhausted.  [*See* Filing No. 259 at 21.]  Again, if expediting costs were covered under the General Coverage Provision, there would be no need to list coverage for expediting costs as an "Additional Coverage."[5]

Additionally, the Policy's ERAL Provision, which is also listed as an "Additional Coverage," similarly indicates that costs falling under the ERAL Provision are not covered by the General Coverage Provision.  [Filing No. 222-3 at 18.]  If such expenses were considered loss to Covered Property, there would be no need to separately address them.  *See One Place*, 2015 WL 2226202 at *10 ("One Place's construction of the Policy would render other provisions in it superfluous in contravention of established law regarding contract interpretation that requires provisions of an insurance policy to be read together so as to give effect to every part.  For example, if the Policy were construed as broadly as One Place suggests, there would be no need for 'Coverage

---

[5] The Expediting Costs provision states that "[t]he most we will pay under this Additional coverage is the least of: (a) 5% of the applicable 'Basic Limit of Insurance'; or (b) $100,000."  [Filing No. 222-3 at 17-18.]  It is undisputed that Travelers has already paid $100,000 in expediting costs to IAA, [Filing No. 247 at 29 (IAA stating that it "does not dispute that Travelers has paid the policy limits of its Expediting Costs Provisions")], so its obligations under this Policy provision have been satisfied.

Extensions' to 'pay for 'loss' from a Covered Cause of Loss' or 'Additional Coverages' to pay for things like debris removal expenses 'caused by or resulting from a Covered Cause of Loss….'") (citations omitted).

The Court concludes that the General Coverage Provision is unambiguous, and that Travelers' interpretation of that provision – that it covers only direct physical damage to a building or structure – is correct.

## 2.  *Effect of Unambiguity of the General Coverage Provision*

Travelers argues that the only direct physical damage covered by the General Coverage Provision is the actual physical damage to the structural steel caused by the Shoring Tower Incident, that the only contractor that performed physical damage repair work was Cives Corporation and its subcontractors, and that all other costs claimed by IAA are "costs associated with resequencing, re-design work, wage increases and other economic costs as opposed to costs to physical damage repair costs." [Filing No. 240 at 39.]  Travelers contends that because it has already paid IAA $4,194,357.26 for "all costs to inspect the physical damage and restore the damaged property to its condition immediately before the loss," it is entitled to judgment as a matter of law for any additional amounts IAA claims it is entitled to under the General Coverage Provision.  [Filing No. 240 at 39-40.]

IAA argues that Travelers is not entitled to judgment as a matter of law that it has paid all costs for physical damage because issues of material fact remain including, for example, whether $4,000,000 in outstanding costs incurred for investigation and inspection due to the Shoring Tower Incident is covered.  [Filing No. 247 at 45-46.]  IAA argues that Travelers "cannot rely on an after-the-fact estimation by its hired expert, based on a preliminary inspection outline, to determine how much of IAA's inspection costs should be covered.  Indeed, nowhere in the Policy does it say that

Travelers will cover only what its expert estimates a task should cost, versus the actual costs incurred by the insured."  [Filing No. 247 at 47 (emphasis omitted).]

The Court's review of the record evidence cited by both parties indicates that at least some of the $4,000,000 in outstanding costs does not relate to physical damage to the property that occurred during the Shoring Tower Incident, and does not constitute "[t]he cost of reasonably restoring that property to its condition immediately before 'loss'," as provided for in the Valuation Provision.  For example, IAA seeks coverage for costs incurred for the services of KCE Structural Engineers, PC ("KCE") which, according to IAA's own witness, include costs that were not related to the direct physical repair of the steel tower.  [*See* Filing No. 238-6 at 8-9 (one of IAA's construction managers, Mark Flandermeyer, testifying that outstanding costs include "other cost associated with the incident that mitigates your risk of going to February," which does not constitute "a repair" to damaged property); Filing No. 238-12 at 10 (John Irwin, one of the managers for the Project, testifying that KCE raised issues with construction and inspection of the steel tower that existed prior to the Shoring Tower Incident); Filing No. 238-12 at 13 (Mr. Irwin testifying that KCE raised an issue with the quality of the steel as it existed prior to the Shoring Tower Incident, and that KCE and Mr. Irwin "spen[t] time on that [issue]"); Filing No. 238-12 at 15-16 (Mr. Irwin testifying that KCE acted as a "peer review" in connection with inspections for welding that had not taken place before the Shoring Tower Incident, were scheduled to take place after the Shoring Tower Incident, and he did not see how weld deficiencies were related to the Shoring Tower Incident); Filing No. 238-10 at 12-13 (IAA's expert, Richard Potosnak, testifying that KCE was retained to conduct a peer review on welds that occurred after the Shoring Tower Incident).]  This testimony indicates that not all of KCE's outstanding charges relate to "reasonably restoring" the

property damaged from the Shoring Tower Incident "to its condition immediately before 'loss'."
[*See* Filing No. 222-3 at 22.]

On the other hand, the Court cannot definitively conclude that none of the outstanding costs are covered under the parameters of the General Coverage Provision that the Court has set forth. For example, IAA seeks payment for certain inspection-related activities performed by KCE. Travelers has argued that it engaged a structural engineer expert, Wade Clarke of the firm Wiss Janney Elstner, to analyze which of KCE's costs are covered by the General Coverage Provision, and which are not.  [Filing No. 255 at 15.]  Based on the parties' discussion of the evidence, which is done in a summary fashion and by way of examples, the Court cannot determine as a matter of law at this stage of the proceeding that none of KCE's inspection-related charges are covered.  It is not sufficient for Travelers to simply argue that its expert did not find any of the outstanding costs to be covered by the Policy.  Determining whether Travelers owes any additional amounts under the General Coverage Provision requires a line-by-line review of outstanding costs, viewed in light of the Court's ruling that the General Coverage Provision only covers the cost of reasonably restoring property damaged from the Shoring Tower Incident to its condition immediately before loss.  The Court is hopeful that, in light of its ruling, the parties will be able to engage in this line-by-line review and reach agreement regarding whether any outstanding amounts are owed and, if so, what those amounts are.  Without more detail regarding those outstanding amounts, however, the Court cannot determine as a matter of law whether Travelers has satisfied its obligations under the General Coverage Provision.

In sum, the Court finds that Travelers is entitled to judgment as a matter of law on the issue of the scope of coverage the General Coverage Provision affords – *i.e.*, that the General Coverage Provision covers only physical damage caused by the Shoring Tower Incident, and the cost of

reasonably restoring the damaged property/building to its condition immediately before the Shoring Tower Incident.  Consequently, IAA is not entitled to summary judgment on that issue.  The Court also finds, however, that Travelers is not entitled to judgment as a matter of law on the issue of whether it has paid all amounts covered by the General Coverage Provision.

### B.  Coverage for "Soft Costs"

The second major dispute between the parties involves whether the Policy covers certain "soft costs" IAA contends it incurred.  The Policy covers soft costs "during the 'period of delay in completion'" resulting from "'loss' to Covered Property from any of the Covered Causes of Loss which delays the completion of the 'project' beyond the 'planned completion date.'"  [Filing No. 222-3 at 14.]  "Soft costs" means IAA's "actual and necessary business costs in excess of [its] budgeted amount for the 'project' consisting only of type shown in the Declarations," which include bond interest.  [Filing No. 222-3 at 10; Filing No. 222-3 at 26.][6]  The "period of delay in completion" – or the period for which soft costs will be paid – is defined as beginning with the "planned completion date," and ending "when the 'project' should be completed using reasonable speed and similar materials and workmanship."  [Filing No. 222-3 at 26.]  The deductible period for soft costs is 90 days, meaning the period of delay must exceed 90 days to trigger coverage.  [Filing No. 222-3 at 11; *see also* Filing No. 222-3 at 21 (Policy providing under the heading "Deductible" and the sub-heading "Soft Costs": "We will not pay the 'amount of loss' until the applicable Deductible shown in the Declarations is exceeded.  We will then pay for that part of the 'amount of loss' incurred by you in excess of such deductible, up to the Limit of Insurance").]

---

[6] The Policy's Declarations also state that "Soft Costs" include "[i]nterest on money borrowed to finance construction," "[a]dvertising expenses," and "[c]osts resulting from the renegotiation of your lease(s) or construction loans."  [Filing No. 222-3 at 10.]  The only soft costs IAA seeks, however, are for "bond interest."  [*See* Filing No. 233 at 23-30.]

IAA argues that it is entitled to interest it paid on certain bonds that financed the Project, which it paid "during the 'period of delay in completion' as a result of the Shoring Tower Incident." [Filing No. 259 at 24.]  It contends that the "period of delay in completion" began on the "planned completion date" of July 24, 2008. [Filing No. 259 at 25-26.]  IAA explains its soft cost claim for bond interest as follows:  "The terms of the Bonds used to finance the Project provide that interest on the Bonds will be paid from bond proceeds, placed in an account known as a capitalized interest account, until the Project is completed…. The Bonds provided that when the Project was completed, IAA would take the funds remaining in the capitalized interest account and transfer them to the construction fund.  Such funds could then be spent on other capital improvement projects.  Thus, the budgeted amount for payment of the bond interest (using bond proceeds prior to completion) was a function of the schedule, and in particular, the date of completion.  Because completion of the Project was delayed due to the Shoring Tower Incident, IAA paid more bond interest out of its capitalized interest account than it otherwise would have, leaving less bond proceeds available to fund other capital improvement projects." [Filing No. 259 at 27-28.]  In other words, IAA does not contend that interest on the bonds went up, or that it paid more in interest than originally budgeted.  Rather, it claims that it had to take more out of the capitalized interest account to pay the bond interest.

Travelers argues that the Policy does not cover the bond interest IAA seeks because: (1) IAA did not incur any bond interest over what it originally budgeted; (2) IAA did not make a soft cost claim during the six-year loss adjustment period, so has breached the Policy provisions and waived any right to make a soft cost claim; and (3) IAA's alleged soft cost loss does not exceed the 90-day deductible in the Policy. [Filing No. 240 at 45-58.]

### 1. Whether IAA incurred "Soft Costs"

Initially, the Court will determine whether IAA incurred soft costs as defined by the Policy. Soft costs – in this case, bond interest – must exceed the "budgeted amount for the 'project' consisting only of type shown in the Declarations." [Filing No. 222-3 at 26.] IAA acknowledges that it did not make payments over and above the original amount budgeted for bond interest. [*See* Filing No. 238-20 at 27-28 (deposition testimony of Robert Duncan, IAA's Rule 30(b)(6) representative: "Q: No changes to the amount of any of those bonds after the steel shift? A: That's correct. Q: No changes to any of the interest payments after the steel shift? …. A: I'm not aware of any changes. Q: No changes to any of the numbers of payments on any of these other debt service schedules? A: I'm not aware of -- Q: No changes to any of the amounts of the payments? A: I have no knowledge of any changes").] Rather, IAA argues that it had to pay more out of its capitalized interest account for bond interest than it had originally budgeted. IAA argues that the term "budgeted amount" is not defined in the Policy, is ambiguous, and should be read to mean the budgeted amount for the entire Project. [Filing No. 247 at 31-32.] Because it had less money left in the capitalized interest account to spend on other construction costs, IAA argues that it paid more than originally budgeted for bond interest. IAA ignores the phrase at the end of the Policy's "Soft costs" definition, however, which provides that soft costs include costs in excess of the budgeted amount for the project "consisting only of type shown in the Declarations." [Filing No. 222-3 at 26.] The Declarations provide that "Soft Costs" include, among other things, "BOND INTEREST AND PENALTIES." [Filing No. 222-3 at 10.] The Court finds that the definition of "Soft costs," the coverage provision for soft costs, and the Declarations related to soft costs are

not ambiguous.  Accordingly, the Court will not consider extrinsic evidence[7] and will apply the soft costs provisions to the facts to determine whether coverage exists under the Policy.  *See Bar Plan Mut. Ins. Co.*, 44 N.E.2d at 1285.

Nowhere in the Declarations are "Soft Costs" defined to mean "amounts withdrawn from the capitalized interest account that IAA budgeted to come from another source."  The bond interest itself must be over the budgeted amount to be considered soft costs, and there is no evidence that payments for the interest on the bonds increased due to the Shoring Tower Incident.  The fact that the payments had to come from another source does not make them soft costs.[8]  The consequence of taking more money from the capitalized interest account to pay for bond interest was that the money could not then be used for other construction projects, as originally planned.  [*See* Filing No. 247 at 33 ("IAA expended additional funds out of its capitalized interest account, which meant such money could not be spent on other projects").]  These "other projects" are not included in the Declarations, as they must to be considered "Soft costs."  [*See* Filing No. 222-3 at 26 ("'Soft costs' means your actual and necessary business costs in excess of your budgeted amount for the 'project' consisting only of type shown in the Declarations").]

---

[7] For example, IAA submits and discusses evidence regarding the parties' negotiations related to coverage for soft costs.  This evidence is irrelevant, because the Policy provisions are unambiguous.

[8] It appears that IAA planned to pay for bond interest from revenues generated when the Project was completed, instead of dipping into the capitalized interest account.  [*See* Filing No. 247 at 31 (IAA stating "Travelers fundamentally misunderstands IAA's capitalized interest account and the significance of IAA's payment of more bond interest from that account, rather than from revenue generated by the new terminal").]  But, as discussed above, the Policy does not provide coverage for budgeted costs that remain the same, but are simply paid from another source due to delay in completion of the Project.

In any event, even if IAA's payment of the same bond interest from a different source could be considered a "soft cost" under the Policy, there are several additional reasons why those costs are not covered.

### 2.  *Whether IAA Waived Its Claim for Soft Costs*

Travelers maintains that IAA has waived any opportunity to seek soft costs under the Policy because neither of the two signed, sworn proofs of loss that IAA submitted included any soft cost claim, including bond interest.  [Filing No. 240 at 52.]  Travelers also argues that IAA specifically told Travelers that it was not making a soft cost claim because "the period of actual delay was less than the 90 day policy deductible."  [Filing No. 240 at 52.]

IAA argues that it submitted a proof of loss, and did not need to submit a supplemental proof of loss if it identified additional damages later.  [Filing No. 247 at 42.]  It argues that "[t]he parties' course of conduct was that no formal amendment or supplementation of the proof of loss form was contemplated or necessary," that Travelers has not identified any prejudice it has suffered from soft costs not being identified in the proofs of loss that IAA submitted, and that Travelers analyzed IAA's soft costs during the claims adjustment period because "IAA has always maintained an ERAL claim, which required that IAA's soft costs be analyzed."  [Filing No. 247 at 42-43.]

Under a section titled "Duties In The Event Of Loss," the Policy provides:

> You must see that the following are done in the event of loss or damage to Covered Property:… 2.  Give us prompt notice of the loss or damage.  Include a description of the property involved….  8.  Send us a signed, sworn proof of loss containing the information we request to settle the claim.  You must do this within 60 days after our request.  We will supply you with the necessary forms….  10.  Cooperate with us in the investigation or settlement of the claim."

[Filing No. 222-3 at 40.]  The Policy also provides that "No one may bring a legal action against us under this Coverage Part unless:  1.  There has been full compliance with all the terms of this Coverage Part…."  [Filing No. 222-3 at 42.]

Indiana law dictates that "Duties In The Event Of Loss" provisions are not cooperation clauses, but rather are conditions precedent that an insured must satisfy before recovering under a policy.  *See, e.g.*, *Griffin v. Allstate Property and Cas. Ins. Co.*, 2012 WL 3611716, *9 (N.D. Ind. 2012)* (insureds "had a duty to comply with ['Your Duties After Loss' provision] and failed to satisfy their obligations under the policy.  It is undisputed that the [insureds] did not comply with the clear terms of the contract and breached their duties thereunder.  Because the [insureds] violated their duties under the contract, [the insurer] was not required to provide coverage").  The insured must establish that it has complied with the "Duties In The Event Of Loss" provision, and the insurer need not have suffered any prejudice to enforce the provision.  *See Morris v. Economy Fire & Cas. Co.*, 848 N.E.2d 663, 666 (Ind. 2006)* ("Your Duties After Loss" provision was not a "cooperation clause," but rather was "an entirely separate condition that explicitly requires the policyholder to perform specific duties.  While disputes regarding alleged breaches of an insured's duty under a separate 'cooperation clause' may necessitate consideration of resulting prejudice to the insurance company, such prejudice is not a necessary consideration in determining the enforceability of other insurance policy provisions") (citing *Miller v. Dilts*, 463 N.E.2d 257, 265 (Ind. 1984)); *Knowledge A-Z, Inc. v. Sentry Ins.*, 857 N.E.2d 411, 420 (Ind. Ct. App. 2006)* (provisions addressing insured's duties after loss (including requirement that insured submit to examination under oath) were distinguishable from a "cooperation clause," "explicitly require[] the policyholder to perform specific duties," and "prejudice [to the insurer] is not a necessary consideration in determining the enforceability of other insurance policy provisions."  Insurer was entitled to

summary judgment because insured did not satisfy duties; policy also contained a provision stating "[n]o action can be brought unless the policy provisions have been complied with….").

IAA has not contradicted with record evidence Travelers' claim that IAA did not include soft costs in the two proofs of loss it submitted.  In fact, IAA tacitly admits this is the case.  [*See* Filing No. 247 at 43 (arguing that "Travelers expressly allowed IAA to amend its claims after submitting the [proof of loss], without requiring IAA to submit a new proof of loss").]  The terms of the "Duties In The Event Of Loss" provisions are unambiguous (IAA does not argue otherwise), and required IAA to include any soft costs claim it was making in its proof of loss.  Because IAA undisputedly did not do that, it cannot now seek coverage for soft costs under the Policy.

The Court rejects any argument by IAA that Travelers knew it was making a soft costs claim because soft costs were discussed during the claim adjustment period in connection with IAA's ERAL claim.  [*See* Filing No. 247 at 43 (IAA arguing that "Soft costs consistently were part of IAA's claims because IAA has always maintained an ERAL claim, which required that IAA's soft costs be analyzed").]  Even if the parties discussed soft costs in connection with an ERAL claim, this was not enough to somehow make Travelers aware that IAA was making a soft costs claim.  Indeed, IAA itself acknowledged in correspondence between its counsel and Travelers' counsel that IAA was *not* making a soft costs claim.  [Filing No. 238-25 at 4 (counsel for IAA writing "[r]egarding some of the questions posed in your August 10 letter, IAA is not making a soft cost claim per se, recognizing that the period of actual delay (due to the mitigation efforts that were undertaken) was less than the 90 day deductible").]  Also telling is the fact that IAA did not assert a soft costs claim when it filed the original Complaint in this matter on August 19, 2013, [Filing No. 1], or the Amended Complaint on August 22, 2013, [Filing No. 7].  It asserted such a

claim for the first time in January 2014, when it sought to file a Second Amended Complaint adding a soft costs claim. [*See* Filing No. 27.]

Because IAA never included a soft costs claim in its proof of loss, it has not met a condition precedent of the Policy and cannot now recover for that amount. *See Foster v. State Farm Fire and Cas. Co.*, 674 F.3d 663, 667-70 (7th Cir. 2012) (insured breached insurance contract under Indiana law when it failed to comply with insurance policy's "Your Duties After Loss" provision by not providing insurer with certain records and documents). Additionally, because it has not complied with the "Duties In The Event Of Loss" provisions, it cannot maintain a legal action against Travelers for the recovery of soft costs. [*See* Filing No. 222-3 at 42 (Policy stating that no action can be brought against Travelers unless insured has fully complied with Policy provisions).] So, to the extent IAA even incurred soft costs, it cannot recover them under the Policy because it did not comply with the Policy's conditions precedent set forth in the "Your Duties In The Event Of Loss" provisions.

### 3. Whether the Soft Costs Deductible Precludes Recovery

Finally, even if IAA incurred soft costs, and even if IAA complied with the Policy's provisions regarding proofs of loss, the Policy would only provide coverage for those soft costs if the "period of delay in completion" exceeded the 90-day deductible in the Policy. The Policy covers soft costs incurred during the "period of delay in completion," which is defined as beginning with the "planned completion date," and ending with the date when the project "should be completed using reasonable speed and similar materials and workmanship." [Filing No. 222-3 at 14; Filing No. 222-3 at 26.] "Planned completion date" is defined as "the date the 'project' would be put into operation or use in the normal course of construction if 'loss' to Covered Property from any of the Covered Causes of Loss had not occurred." [Filing No. 222-3 at 26.]

The parties agree that the ending date for the "period of delay in completion" – or the date when the Project "should be completed using reasonable speed and similar materials and workmanship" – is December 16, 2008.  [*See* Filing No. 240 at 58 (Travelers using December 16, 2008 as the "end date of the 'period of delay in completion'"); Filing No. 247 at 36 (IAA stating "IAA agrees that the end date of the 'period of delay in completion' is December 16, 2008….").]  The parties disagree, however, regarding the beginning date for the "period delay in completion," defined in the Policy as the "planned completion date."  Specifically, Travelers maintains that the "planned completion date" was September 28, 2008, or the date that the Project was to be put into operation.  [Filing No. 240 at 57-58.]  Travelers asserts that the "period of delay in completion" would then only be 79 days (September 28, 2008 to December 16, 2008), so would not exceed the 90-day deductible period.  [Filing No. 240 at 57-58.]

IAA's position is that the "planned completion date" was the planned date of "substantial completion," not the planned date for the Project to be put into operation.  [Filing No. 259 at 25.]  IAA argues that the construction schedule defined both substantial completion and opening day, but not "planned completion date," and relies upon the industry meaning and statutory meaning of "substantial completion" to argue that the planned date of substantial completion was July 24, 2008.  [Filing No. 233 at 25-26.]  Based on that date, IAA asserts that the "period of delay in completion" would be July 24, 2008 to December 16, 2008, or 146 days – making the "period of delay in completion" 55 days more than the 90-day deductible.  [Filing No. 247 at 36-37.]

The Policy defines "Planned completion date" as: "the date the 'project' would be put into operation or use in the normal course of construction if 'loss' to Covered Property from any of the Covered Causes of Loss had not occurred."  [Filing No. 222-3 at 26.]  The Court finds this definition to be unambiguous, and to mean the date the Project would have opened as an airport absent

the Shoring Tower Incident.  IAA's interpretation of this definition as meaning the planned date of "substantial" completion simply is not supported by the plain language of the Policy.  "Planned completion date" could have been defined as "the date the 'project' would be substantially completed if 'loss' to Covered Property from any of the Covered Causes of Loss had not occurred." But the Policy does not say this.  The plain meaning of the term "planned completion date," as defined in the Policy, is the date that IAA planned to start using the Project as an airport.  This equates with the planned "opening day" date of September 28, 2008.

Because the "planned completion date" was September 28, 2008, and the date when the Project should have been completed using reasonable speed and similar materials and workmanship was December 16, 2008 (as the parties agree), the "period of delay in completion" was only 79 days, so was within the Policy's 90-day deductible for soft costs coverage.[9]  Accordingly, the Policy does not provide coverage for any soft costs incurred.

In sum, Travelers is entitled to summary judgment on IAA's soft costs claim because IAA did not incur the type of soft costs covered by the Policy, IAA did not comply with the Policy's conditions precedent to recovering soft costs, and any soft costs IAA incurred fell within the Policy's 90-day deductible period.[10]

### C.  Coverage Under the Policy's ERAL Provision

IAA also seeks coverage for over $4,000,000 of expenses under the Policy's ERAL Provision.  That provision states:

> We will pay the necessary expense you incur during the "post-loss period of construction" if you would not have incurred such expense had there not been "loss"

---

[9] It is also worth noting that the airport opened for business on November 11, 2008, just 44 days after the "planned completion date" and also well within the 90-day deductible period.

[10] The Court need not address IAA's argument that its construction costs do not have to exceed their budgeted amount in order for IAA to maintain a soft costs claim.  [*See* Filing No. 259 at 31.] As discussed above, the Policy does not provide soft costs coverage for numerous other reasons.

to Covered Property from any of the Covered Causes of Loss which delayed the completion of the "project" beyond the "planned completion date". But we will not pay more for your expense than the amount by which such expense reduces the "amount of loss" we would have otherwise paid.

[Filing No. 222-3 at 18.]

Travelers has maintained that IAA is not entitled to coverage under the ERAL Provision because it did not incur any soft costs, which it argues is a prerequisite to coverage under the ERAL Provision. [Filing No. 240 at 58-61.] IAA argues that a compensable soft costs claim is not required to maintain an ERAL claim, and that Travelers is attempting to "penalize IAA for undertaking efforts to reduce delay from a duration that would support a compensable soft cost claim, to a duration that would not." [Filing No. 247 at 37.]

The key to determining Travelers' potential liability under the ERAL Provision is the second-to-last sentence of the provision, which states: "But we will not pay more for your expense than the amount by which such expense reduces the 'amount of loss' we would have otherwise paid." [Filing No. 222-3 at 18.] "Amount of loss" is defined as "the sum of your actual 'soft costs', as covered by this policy." [Filing No. 222-3 at 23.] The second-to-last sentence of the ERAL Provision, coupled with the Policy's definition of "amount of loss," is unambiguous, and means that Travelers will only pay amounts under the ERAL Provision up to the amount by which those amounts reduce soft costs Travelers would have otherwise paid. [Filing No. 222-3 at 18.] As discussed above, IAA did not incur any soft costs for which coverage is provided under the Policy. Accordingly, there are no ERAL amounts to reduce soft costs that Travelers would have otherwise paid, because Travelers was not obligated to pay any soft costs. *See One Place*, 2015 WL 2226202 at *8 (same Travelers' ERAL Provision "makes it clear that Travelers must pay for the stated additional expenses only to the extent that they reduce the amount that it otherwise must

pay for amount of loss [in that case, soft costs and rental value]").  Because Travelers is not obligated to pay for any soft costs under the Policy, coverage under the ERAL Provision is not triggered and Travelers is entitled to judgment as a matter of law that IAA is not entitled to any amounts under that provision.

### D.    Affirmative Defense 23

In its Answer to the Second Amended Complaint, Travelers asserted as an affirmative defense:

> Plaintiff's Complaint should be dismissed to the extent it concerns or relates to any alleged circumstances, accidents, losses, occurrences or damages that took place outside of the policy period or any other relevant primary or excess insurance policy issued by Travelers or any other related or affiliated entity upon which Plaintiff is basing its claims.  Also, this action should be dismissed to the extent the alleged accidents, losses, occurrences or damages took place at a location, premises or property and/or equipment not covered by the policy or any other relevant insurance policy issued by Travelers or any other related or affiliated entity.  Furthermore, this action should be dismissed to the extent that any alleged circumstances, accidents, losses, occurrences or damages that took place after any cancellation of the policy or any other relevant insurance policy issued by Travelers or any other related or affiliated entity upon which Plaintiff is basing its claims.

[Filing No. 40 at 26.]

IAA argues that it is entitled to summary judgment that this affirmative defense does not apply because it has paid costs after the Policy's May 20, 2007 ending date that were still incurred as a result of the Shoring Tower Incident, and those costs are covered.  [Filing No. 259 at 34-35.] Travelers' position is that this affirmative defense is not applicable to the coverage issues raised in the parties' cross motions for summary judgment, and "[n]owhere in Travelers' claim decision…has Travelers taken the position that the expiration of the policy in and of itself is the reason that a claimed cost is not covered."  [Filing No. 240 at 61.]

The Policy provides that "We cover loss or damage commencing: 1. During the policy period shown in the Declarations; and 2. Within the coverage territory."  [Filing No. 222-3 at 42.]

Travelers appears to assert in Affirmative Defense 23 that it is not liable under the Policy for costs in connection with an accident that occurs outside of the Policy period or, more specifically, after May 20, 2007.  [*See* Filing No. 40 at 26.]   IAA interprets Affirmative Defense 23 to mean that Travelers is denying coverage for any costs associated with the Shoring Tower Incident which were actually paid after May 20, 2007.  The Court interprets Affirmative Defense 23 as simply being a broad assertion by Travelers that the accident for which coverage is provided must occur during the Policy period, and the parties do not dispute that the Shoring Tower Incident did.  To the extent that Affirmative Defense 23 is meant to assert that there is no coverage under the Policy for otherwise-covered costs associated with the Shoring Tower Incident merely because IAA paid them after May 20, 2007, the Court finds that such a basis for denying coverage is not supported by the Policy language.  But, as discussed above, this is not how the Court reads Affirmative Defense 23.  Because it is a general defense that the Policy does not cover loss from accidents occurring outside the Policy period, Affirmative Defense 23 does not impact the coverage issues discussed herein and remains a viable affirmative defense.

## V.
### CONCLUSION

For the foregoing reasons, the Court **DENIES** IAA's Motion for Partial Summary Judgment in its entirety, [Filing No. 222], and **GRANTS** Travelers' Cross Motion for Summary Judgment, [Filing No. 238], to the extent that it finds that the disputed Policy provisions are unambiguous, and:

- Coverage under the Policy's General Coverage Provision is limited to direct physical damage caused by the Shoring Tower Incident only, and the cost of reasonably restoring the damaged property to its condition immediately before the Shoring Tower Incident;

- The Policy's Expediting Costs Provision gave IAA $100,000 of coverage for expediting costs, which are not covered under the Policy's General Coverage

Provision.  Travelers has already paid IAA the $100,000 coverage limit under the Expediting Costs Provision;

- IAA is not entitled to "soft costs" under the Policy because:

  o IAA's payment of bond interest during the "period of delay in completion" was not a soft cost in excess of the amount it had budgeted for the Project;

  o IAA failed to include a soft costs claim in its proofs of loss, so did not comply with a condition precedent to coverage for soft costs under the Policy; and

  o The "planned completion date" under the Policy was September 28, 2008 and the ending date was December 16, 2008, so the "period of delay in completion" did not exceed the 90-day soft costs deductible;

- IAA is not entitled to ERAL coverage under the Policy because it does not have a compensable soft costs claim; and

- Affirmative Defense 23 is a general defense that the Policy does not cover costs related to accidents occurring outside the Policy period, so is a viable affirmative defense and does not impact the coverage issues discussed herein.

The Court **DENIES IN PART** Travelers' Cross Motion for Summary Judgment, [Filing No. 238], however, to the extent that the Court cannot conclude as a matter of law that Travelers has paid all costs covered by the Policy's General Coverage Provision.  No partial final judgment shall issue at this time.

It is the Court's hope that this ruling significantly limits the issues that remain in this litigation, and the Court requests that the Magistrate Judge confer with the parties to address the possibility of resolving the remaining issue – *i.e.*, whether any outstanding costs fall within the Policy's General Coverage Provision, in light of the Court's finding regarding the parameters of that provision – prior to the June 6, 2016 trial scheduled in this matter.[11]

---

[11] The Court also requests that the Magistrate Judge confer with the parties to determine whether the recently-filed motions seeking to exclude certain witness testimony are relevant to the issues that now remain in this litigation.  [*See* Filing No. 278; Filing No. 280; Filing No. 282; Filing No. 284.]

Date:  April 13, 2016

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**