UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANAPOLIS AIRPORT AUTHORITY, | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| *vs.* | ) | 1:13-cv-01316-JMS-MPB |
| | ) | |
| TRAVELERS PROPERTY CASUALTY COMPANY | ) | |
| OF AMERICA, | ) | |
| *Defendant.* | ) | |

**<u>ORDER</u>**

Presently pending before the Court in this insurance coverage case are the following: (1) a Motion to Exclude Opinion Testimony of Richard Potosnak filed by Defendant Travelers Property Casualty Company of America ("Travelers"), [Filing No. 282]; and (2) a Motion to Exclude the Opinion Testimony of Mark Flandermeyer, also filed by Travelers, [Filing No. 284].

**I.**
**BACKGROUND**[1]

This extremely contentious case relates to insurance coverage for an incident that occurred during construction of the New Midfield Terminal Project (the "Project"), a project owned by Plaintiff Indianapolis Airport Authority ("IAA") which involved construction at the Indianapolis International Airport. [Filing No. 35 at 2.] To cover certain aspects of the Project, IAA purchased a Commercial Inland Marine Insurance Policy from Travelers with an effective policy period of May 20, 2006 to May 20, 2007 (the "Policy"). [Filing No. 222-2 at 29-30; Filing No. 222-3 at 3; Filing No. 222-3 at 10.]

---

[1] Much of this background is taken from the Court's Statement of Facts set forth in its April 13, 2016 Order on IAA's and Travelers' cross motions for summary judgment. [Filing No. 288.]

During construction of the Project, two temporary shoring towers were being used to lift steel trusses into place so that they could be installed as part of the high roof structure. [Filing No. 222-6 at 2.] On January 24, 2007 the shoring towers failed, causing the portion of the roof structure that was being built to drop a foot or more and land on already-installed structural framing below (the "Shoring Tower Incident"). [Filing No. 222-6 at 2; Filing No. 222-7 at 6.] Immediately following the Shoring Tower Incident, construction on the Project ceased and the damaged structure was evaluated to determine the scope and impact of the Shoring Tower Incident, the scope and plan for work needed to repair damage, and the means and methods required to accomplish those repairs. [Filing No. 222-6 at 3; Filing No. 222-9 at 6-7.]

After the Shoring Tower Incident, Travelers considered IAA's claim under the Policy and paid: (1) $4,194,357 for costs to inspect the physical damage and restore the damaged property to the condition immediately before the loss, [Filing No. 238-15 at 15; Filing No. 238-16 at 5-6; Filing No. 238-17 at 17; Filing No. 238-17 at 23; Filing No. 238-18 at 4]; and (2) $100,000 for "Expediting Costs and Additional Cost of Construction Materials and Labor," [Filing No. 238-15 at 20-21; Filing No. 238-16 at 11; Filing No. 238-17 at 17; Filing No. 238-17 at 23; Filing No. 238-18 at 4].

IAA initiated this lawsuit against Travelers on August 19, 2013, [Filing No. 1], and filed the operative Second Amended Complaint on February 27, 2014, [Filing No. 35]. IAA sought several declarations regarding the scope of coverage provided by the Policy, and filed a Motion for Partial Summary Judgment on November 16, 2015 seeking those declarations. [Filing No. 35; Filing No. 222.] Travelers filed a Cross Motion for Summary Judgment on December 17, 2015, asking the Court to declare that no coverage existed for any of the remaining amounts IAA seeks under the Policy. [Filing No. 238.]

2

The Court ruled on the cross motions for summary judgment on April 13, 2016, finding that the only Policy provision Travelers under which Travelers could potentially owe further payments was the Policy's General Coverage Provision.  [Filing No. 288 at 30-32.]  The Court found that coverage under the Policy's General Coverage Provision is limited to direct physical damage caused by the Shoring Tower Incident, measured by the cost of reasonably restoring the damaged property to its condition immediately before the Shoring Tower Incident.  [Filing No. 288 at 30.] It also found, however, that because the parties focused their arguments on the construction of the Policy as opposed to any specific claimed costs, it could not conclude as a matter of law that Travelers had paid all costs covered by the Policy's General Coverage Provision.  [Filing No. 288 at 31.]  The Court noted, however, that its "review of the record evidence cited by both parties indicates that at least some of the $4,000,000 in outstanding costs does not relate to physical damage to the property that occurred during the Shoring Tower Incident, and does not constitute '[t]he cost of reasonably restoring that property to its condition immediately before 'loss',' as provided for in the Valuation Provision," and discussed some examples of outstanding costs that would not be covered under the Policy.  [Filing No. 288 at 16-17.]

A jury trial in this matter is scheduled for June 6, 2016, and the only issue that remains for the jury is whether any of IAA's outstanding costs fall within the parameters of the General Coverage Provision as set forth in the Court's April 13, 2016 Order.  Confusion has abounded regarding the specific costs for which IAA seeks coverage now that the Court has interpreted the Policy's coverage provisions.  Most recently, Travelers has represented (and IAA has not disputed) that IAA will "be seeking recovery for certain [costs from a structural engineering firm, KCE] and Harmon[]…incurred between the date of the Shoring Tower Incident…and May 15, 2007," which total $2,422,233.03.  [Filing No. 335 at 1.]  It appears, however, that IAA will contend at trial that

3

all costs incurred during that time period are covered under the Policy, as it has not provided any type of segregation of those costs between those that are related to reasonably restoring the damaged property to its condition before the Shoring Tower Incident, and those that are not related.

One thing is now clear, however:  IAA intends to rely heavily upon the testimony of Richard Potosnak and Mark Flandermeyer in arguing that the outstanding costs it seeks are covered under the Policy's General Coverage Provision.  [*See* Filing No. 306 at 4 (IAA stating in its Trial Brief that "IAA anticipates that certain of its witnesses – most likely Richard Potosnak and Mark Flandermeyer… – may offer opinions regarding IAA's damages which are based upon particularized knowledge gained from their experiences as the Owner's Technical Representative (Potosnak) and Project Manager for Hunt/Smoot (Flandermeyer) on the Project….").]  Travelers has moved to exclude much of those witnesses' testimony, and the Court considers those motions.

## II.
### APPLICABLE LAW

Fed. R. Civ. P. 26(a)(2)(A) provides that a party must "disclose to the other parties the identity of any witness it may use at trial to present evidence" of the witness' opinion as an expert under Fed. R. Evid. 702.  Fed. R. Civ. P. 26(a)(2)(B) requires designated experts to produce detailed reports, but only "if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony."  "The purpose of the report is to provide adequate notice of the substance of the expert's forthcoming testimony and to give the opposing party time to prepare for a response."  *Meyers v. National R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734 (7th Cir. 2010).  When a party fails to comply with the requirements of Rule 26(a)(2)(B), the consequence is "exclusion of an expert's testimony…'unless the failure was substantially justified or is harmless.'"  *Id.* (quoting *Gicla v. United States*, 572 F.3d 407, 410 (7th Cir. 2009)).

4

The Advisory Committee notes to Rule 26 state:

> The requirement of a written report in paragraph (2)(B), however, applies only to those experts who are retained or specially employed to provide such testimony in the case or whose duties as an employee of a party regularly involve the giving of such testimony.  A treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report.

Fed. R. Civ. P. 26, Advisory Committee Note to 1993 Amendment, Paragraph (2).

A witness' opinion is considered a lay opinion if it is "limited to what he observed…." U.S. v. Christian, 673 F.3d 702, 708 (7th Cir. 2012) (citing U.S. v. Gaytan, 649 F.3d 573, 581 (7th Cir. 2011)).  But a witness testifies as an expert, even when he has personally observed certain facts or data, when he "brings the wealth of his experience…to bear on those observations and makes "connections for the jury based on that specialized knowledge."  Gaytan, 649 F.3d at 581; see also United States v. Fenzi, 670 F.3d 778, 782 (7th Cir. 2012).

Where "a witness with specialized…knowledge was also personally involved in the factual underpinnings of the case," the distinction between expert and lay testimony can become blurred. United States v. White, 492 F.3d 380, 401 (6th Cir. 2007); see also Christian, 673 F.3d at 708.  A hybrid fact/expert witness is one who has formed their opinion during the course of their work. See Meyers, 619 F.3d at 734-35 (holding that a treating physician who is offering to provide expert testimony as to the cause of the plaintiff's injury, but who did not make that determination in the course of providing treatment, "should be deemed to be one 'retained or specially employed to provide expert testimony in the case,' and thus is required to submit an expert report in accordance with Rule 26(a)(2)").  A hybrid fact/expert witness is not required to provide a written expert report, but must disclose "the subject matter on which the witness is expected to present evidence under Federal Rules of Evidence 702, 703, or 705; and a summary of the facts and opinions to which the witness is expected to testify."  Fed. R. Evid. 26(a)(2)(B) and (C).

IAA has the burden of demonstrating that Mr. Potosnak's and Mr. Flandermeyer's testimony meets the requirements of the Rules of Evidence, and is otherwise admissible. *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (proponent of testimony has burden of showing it is admissible under the Rules of Evidence); Fed. R. Evid. 702, Advisory Committee Note to 2000 Amendments ("[T]he admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence"). It is undisputed that no expert report was prepared by either Mr. Potosnak or Mr. Flandermeyer, so IAA has the additional burden of showing that Mr. Potosnak and Mr. Flandermeyer were not obligated to provide expert reports under Fed. R. Civ. P. 26. *Meredith v. Int'l Marine Underwriters*, 2011 WL 1466436, *4 (D. Ma. 2011) ("A party seeking to avoid producing an expert report bears the burden of demonstrating that the witness is a hybrid").

### III.
### TRAVELERS' MOTION TO EXCLUDE OPINION TESTIMONY OF RICHARD POTOSNAK

#### A. Relevant Background Information

##### *1. Mr. Potosnak's Role*

Richard Potosnak was IAA's paid Owner's Technical Representative ("OTR") for the Project, and IAA has identified him as a "hybrid fact/expert witness." [Filing No. 80-6; Filing No. 254-1 at 6; Filing No. 282-1 at 19.] He described his role as managing the construction manager, Hunt/Smoot, and being "the primary point of contact for the [Shoring Tower Incident]." [Filing No. 254-1 at 6.] Mr. Potosnak also managed the budget for the Project. [Filing No. 282-1 at 4.] As part of his role as OTR, Mr. Potosnak reviewed invoices that were first generated by a contractor, submitted for review to Hunt/Smoot, submitted for review to designers, then submitted to him. [Filing No. 282-1 at 28.] He would then review them from an accounting, technical, and cost

6

accounting perspective, sign off on them, and they would be submitted to IAA for payment.  [Filing No. 282-1 at 28.]

Mr. Potosnak is an architect, and testified that he has expertise in project and construction management.  [Filing No. 254-1 at 6.]  He has never testified as an expert witness in another case, nor has he ever been qualified by a court as an expert.  [Filing No. 254-1 at 8.]  He is not an engineer, and testified that he is not qualified to determine the status of a structure.  [Filing No. 244-2 at 32.]  Mr. Potosnak testified that he has experience administratively managing other engineers, and reviewing other engineers' reports for purposes of reporting to IAA on technical issues.  [Filing No. 244-2 at 32.]

Mr. Potosnak's role as OTR ended in 2010 or 2011, when the Project was complete.  [Filing No. 282-1 at 5.]  IAA engaged him sometime during 2013, however, to assist IAA with its claim under the Policy.  [Filing No. 282-1 at 5.]  In that role, Mr. Potosnak helped IAA and its counsel gather information to include in spreadsheets that were presented to Travelers.  [Filing No. 282-1 at 16.]  Mr. Potosnak described his involvement with the Shoring Tower Incident as reviewing invoices and determining whether a particular invoice should be coded with a project code that Hunt/Smoot had established for the Shoring Tower Incident for recommendation for payment to IAA.  [Filing No. 282-1 at 28.]

### 2.   The Nature of Mr. Potosnak's Anticipated Testimony

At the outset, the Court notes that Travelers filed their Motion to Exclude before the Court had ruled on the cross motions for summary judgment, which significantly narrowed the issues in the litigation.  Accordingly, it is important to set forth the testimony for which the parties appear

to dispute admissibility, given the Policy's coverage parameters set forth by the Court.  IAA disclosed Mr. Potosnak as a "hybrid fact/expert witness" on October 16, 2014.  [Filing No. 80-6.]

IAA originally described Mr. Potosnak's anticipated testimony as follows:

> Mr. Potosnak will testify on factual matters regarding the construction of the Project; the events surrounding the [Shoring Tower Incident]…, the costs incurred due to the Shoring Tower Incident; and actions taken and decisions made during the course of the Project, some of which may constitute expert opinion.  Among other things, Mr. Potosnak may testify that the costs incurred by IAA and reflected on AIRPORT_0018122-130 and totaling $9,278,228.12 were incurred because of the Shoring Tower Incident; that the costs incurred by IAA and reflected on AIRPORT_0018122-130 under the column entitled "AMOUNT COVERED UNDER INSURANCE PROVISION A.5.j EXPENSE TO REDUCE 'AMOUNT OF LOSS,'" and totaling $4,193,097.02 were incurred to reduce the period of delay in completion of the Project; and that Hunt/Smoot prepared a schedule in or around January 2008, projecting the dates of completion for the Project using ordinary, reasonable speed and similar materials and workmanship as originally planned, without employing acceleration, resequencing or extraordinary measures to reduce the delay.

[Filing No. 80-6.]

IAA now states that it will not offer certain testimony in light of the Court's summary judgment rulings, including: (1) that each and every one of the $9,278,228.12 in costs reflected on AIRPORT_0018122-130 was incurred because of the Shoring Tower Incident; (2) that $4,193,097.02 in costs incurred by IAA were incurred to reduce the period of delay in completion; (3) that the January 2008 Hunt/Smoot schedule projected the dates of completion of the Project using ordinary speed and similar materials and workmanship as originally planned; and (4) the period of delay due to the Shoring Tower Incident.  [Filing No. 313 at 2-3.]  So, IAA has removed all specific examples that it had previously provided in its description of Mr. Potosnak's testimony, leaving only the general description of: "factual matters regarding the construction of the Project; the events surrounding the [Shoring Tower Incident;]… the costs incurred due to the Shoring Tower Incident; and actions taken and decisions made during the course of the Project, some of

8

which may constitute expert opinion." [*See* Filing No. 80-6.] And significantly, IAA added in its description of Mr. Potosnak's testimony in its Trial Witness List filed earlier this month that Mr. Potosnak will testify regarding "his apportionment of engineering fees spent on the Shoring Tower Incident made during the Project." [Filing No. 316 at 1.]

Travelers deposed Mr. Potosnak over the course of two non-consecutive days – the first ended at the seven-hour mark when IAA's counsel ended the deposition; the second took place after the Court granted Travelers permission to finish deposing Mr. Potosnak due in part to IAA's counsel's "repeated use of meritless objections" which "bordered on inappropriate and frustrated the efficient use of the allotted deposition time." [*See* Filing No. 200 at 7-8.] IAA has not provided a Rule 26(a)(2)(B) expert report for Mr. Potosnak, nor has it supplemented its hybrid fact/expert witness disclosure.  Its first revelation of the provision of apportionment testimony came in the final Trial Witness List as identified above.

**B.  Discussion**

Travelers argues that Mr. Potosnak's "purported expert opinion testimony" must be excluded because: (1) his testimony cannot constitute "hybrid expert" testimony since his opinions were not formed during the ordinary course of his employment as OTR, but rather were formed for purposes of this litigation and at the direction of IAA's counsel – accordingly, he was required to file a written report containing his opinions, and he has not done so; (2) even if his testimony is considered hybrid expert testimony, Mr. Potosnak is not qualified to offer his opinions because they are outside the scope of his job as OTR; (3) Mr. Potosnak's opinions do not meet the standards for reliability because he did not follow recognized or reliable methodology for analyzing the causal relationship between the costs, the Shoring Tower Incident, and the Policy; (4) Mr. Potosnak's opinions that outstanding costs were "due to," "related to," or "because of" the Shoring

9

Tower Incident are irrelevant and are more prejudicial than probative; and (5) IAA's instructions to Mr. Potosnak not to answer certain questions at his deposition due to privilege impeded and precluded full discovery.  [Filing No. 283 at 2-3.]  The Court will address the categories of testimony at issue in this motion.

> 1. *Whether the Testimony IAA Has Represented Mr. Potosnak Will Provide Is Admissible*

The Court's review of this motion has been particularly difficult because IAA still has not clarified the precise testimony it intends to offer from Mr. Potosnak.  In fact, the scope of his testimony is a moving target.  The Court has looked to IAA's witness disclosures for Mr. Potosnak, its Trial Witness List, and the parties' representations in their briefs.  Doing so, the Court has been able to glean that IAA plans to offer the following testimony – some general, and some specific:

- Testimony on "factual matters regarding the construction of the Project; the events surrounding the [Shoring Tower Incident]; the costs incurred due to the Shoring Tower Incident; and actions taken and decisions made during the course of the Project, some of which may constitute expert opinion," [Filing No. 80-6 at 2];

- Testimony regarding "the construction of the Project; [Mr. Potosnak's] role on the Project; the circumstances of the Shoring Tower Incident; the effects of the Shoring Tower Incident on the Project; steps taken to address the Shoring Tower Incident, including the hiring of a forensic engineer (KCE); the work performed by KCE and its subconsultants, which he approved for payment by IAA; how KCE's work impacted the Project; IAA's payment of KCE's costs and fees; IAA's communications with Travelers, including documentation submitted to Travelers; and IAA's claimed damages.  Mr. Potosnak is also expected to testify regarding his apportionment of engineering fees spent on the Shoring Tower Incident made during the Project.  Mr. Potosnak may also testify as to information contained in IAA's answers and responses to Travelers' discovery requests, as well as the subjects addressed in his deposition," [Filing No. 316 at 1];

- "the fact that [a finite elements computer model created by KCE (the "KCE Model")] was created, the data that went into the creation of the model (he was aware of the information KCE used to create it), that there were multiple iterations of the model, and that the model – correct or no – influenced the inspections that were being performed and the decisions that were being made on the

10

Project, in light of information received from the forensic engineer," [Filing No. 313 at 4];

- A document which plots the locations of KCE's inspections (the "KCE Document") to the extent it shows "the dates and/or costs for certain services performed by KCE and its subconsultants on the Project," [Filing No. 313 at 4]; and

- "[F]actual events on the Project that are inconsistent with assumptions underlying the opinions of Travelers' experts," [Filing No. 313 at 5].

Travelers first argues that the Court should exclude Mr. Potosnak's opinions because they are not hybrid fact/expert testimony since he was specifically retained and paid by IAA, his opinions were formulated specifically for the litigation, and he did not provide an expert report as required by Fed. R. Civ. P. 26(a)(2)(B).  [Filing No. 283 at 8-14.]  Specifically, Travelers argues that true hybrid witnesses can only be considered as such if they form their opinions before the prospect of litigation, and that someone who was retained to provide expert testimony cannot be considered a hybrid witness.  [Filing No. 283 at 8.]  Travelers asserts that Mr. Potosnak was hired by IAA in 2013 (after the Project was completed and when litigation was anticipated) to review documents including depositions of other witnesses, Travelers' experts' reports, and Hunt/Smoot's schedule of project completion, which he could "rely on as a basis for opinions that he specifically crafted for this litigation."  [Filing No. 283 at 10.]   Travelers also contends that Mr. Potosnak reviewed depositions, documents, and information presented to him by IAA's counsel in between the first and second days of his deposition, and offered new opinions during the second day of his deposition.  [Filing No. 283 at 11.]  Travelers argues that IAA presented Mr. Potosnak with the KCE Model, which was created by a structural engineer hired after the Shoring Tower Incident, and which "purportedly shows the area of the structure impacted by the Shoring Tower [Incident]," that "it appears that IAA plans to have Potosnak testify to this model and present post-litigation structural engineering opinions in place of KCE regarding this model and the impact of the Shoring

Tower [Incident] on the structure as shown in [the KCE Model]," and that Mr. Potosnak cannot testify as to the KCE Model because he has no engineering experience, and did not personally develop the model. [Filing No. 283 at 13.] Travelers also points to the KCE Document, which was created by Mr. Potosnak after IAA anticipated litigation in 2013. [Filing No. 283 at 13.] It argues that the document is based on inspection work done by others, and that Mr. Potosnak is not qualified to offer testimony as to the document because it "is simply his personal characterization of the opinions of others or IAA's legal arguments." [Filing No. 283 at 13.][2]

In response, IAA argues that Mr. Potosnak's testimony is really factual in nature, and not opinion testimony. [Filing No. 313 at 3.] For example, it argues that Mr. Potosnak's testimony regarding the KCE Model will be limited to "the fact that the model was created, the data that went into the creation of the model (he was aware of the information KCE used to create it), that there were multiple iterations of the model, and that the model – correct or no – influenced the inspections that were being performed and the decisions that were being made on the Project, in light of information received from the forensic engineer." [Filing No. 313 at 4.] Additionally, IAA argues that the KCE Document was created from inspection reports Mr. Potosnak had knowledge of, shows where KCE's inspections took place, and was created based on Mr. Potosnak's experience as OTR on the Project. [Filing No. 313 at 3-4.] IAA also argues that Mr. Potosnak can testify

---

[2] Travelers argues that "IAA also had Potosnak review Hunt Smoot's schedule of project completion to bolster his post litigation opinions the [Shoring Tower Incident] impacted the opening date of the airport." [Filing No. 283 at 10.] The Court finds this issue moot given its summary judgment rulings, and IAA concedes this is the case as well, [Filing No. 313 at 5 (stating that the Hunt/Smoot issue "may be moot, given the Court's Summary Judgment Order").] Timing related to completion of the Project and the opening date of the airport was relevant to several issues raised in the cross motions for summary judgment, but is not relevant to the only issue that remains in the litigation. Accordingly, the Court need not consider arguments regarding Mr. Potosnak's review of Hunt/Smoot's schedule.

regarding "factual events on the Project that are inconsistent with assumptions underlying the opinions of Travelers' experts." [Filing No. 313 at 5.] IAA asserts that to the extent any of Mr. Potosnak's testimony is deemed opinion testimony, he was not required to provide an expert report because he is a hybrid witness since he developed his opinions as part of his work on the Project. [Filing No. 313 at 10.] It also argues that to the extent the Court finds Mr. Potosnak should have been disclosed as an expert, his testimony should still be allowed because IAA "provided a comprehensive Rule 26 disclosure for Potosnak, identifying in detail his anticipated testimony." [Filing No. 313 at 12.] It asserts that Travelers questioned Mr. Potosnak about the testimony that it seeks to exclude, so would not be prejudiced if the testimony is admitted. [Filing No. 313 at 12.]

On reply, Travelers states that since the Court's Order on the cross motions for summary judgment, IAA has informed it that it is only seeking certain costs incurred from KCE and Harmon from the date of the Shoring Tower Incident until May 15, 2007, when repairs were complete on the shoring tower – an amount totaling $2,422,233.03. [Filing No. 335 at 1.] Travelers reiterates its argument that any opinions Mr. Potosnak could offer at trial regarding the KCE and Harmon costs constitute expert testimony because he was retained post-litigation to form those opinions. [Filing No. 335 at 2-3.] Travelers also argues that Mr. Potosnak continues to form new opinions as trial approaches, and that those new opinions have not been disclosed to Travelers. [Filing No. 335 at 3.] For example, Travelers argues that Mr. Potosnak testified in his deposition that he had not segregated the KCE and Harmon costs between those related to repairs from the Shoring Tower Incident and those not related. [Filing No. 335 at 3.] However now, Travelers notes, IAA has described Mr. Potosnak's testimony in its Trial Witness List as including testimony regarding apportionment of those costs. [Filing No. 335 at 3-4.] Travelers argues that Mr. Potosnak's testimony in that regard is not "factual" because he did not participate in any inspections or perform

any causal analysis of KCE's activities.  [Filing No. 335 at 8-9.]  Finally, Travelers asserts that IAA's failure to disclose Mr. Potosnak's new opinions has unfairly prejudiced Travelers, requiring those opinions to be excluded.  [Filing No. 335 at 13-15.]

It does not appear to be disputed that any factual testimony that Mr. Potosnak learned while he was the OTR on the Project would be admissible as lay testimony.  Again, it is difficult to know exactly what lay testimony IAA plans to offer, but the Court notes that the following testimony identified by IAA likely falls into the "factual testimony" category:  the construction of the Project; the events surrounding the [Shoring Tower Incident]; actions taken and decisions made during the course of the Project; Mr. Potosnak's role on the Project; the circumstances of the Shoring Tower Incident; the effects of the Shoring Tower Incident on the Project; steps taken to address the Shoring Tower Incident, including the hiring of KCE; and facts surrounding IAA's payment of KCE's costs and fees.

Testimony that relates to knowledge or opinions Mr. Potosnak obtained or formed when IAA re-hired him in 2013 to assist with the litigation is a much closer call.  The timing itself is not determinative of whether the testimony should be considered expert testimony, but rather the Court focuses on whether Mr. Potosnak relied more upon his general experience than on his experience as OTR on the Project.  If it is the former, then the testimony would be considered expert testimony. *Gaytan*, 649 F.3d at 581 (a witness testifies as an expert, even when he has personally observed certain facts or data, when he "brings the wealth of his experience…to bear on those observations and ma[kes] connections for the jury based on that specialized knowledge") (citation and quotation omitted).

The Court looks first to two specific areas of testimony the parties have identified – testimony regarding the KCE Model and testimony regarding the KCE Document.  The KCE Model

purports to show the area of the structure that was damaged by the Shoring Tower Incident.  The Court need not determine whether Mr. Potosnak is considered an expert witness or a hybrid witness for purposes of providing this testimony.  Even if Mr. Potosnak is considered a hybrid witness, Rule 26 required IAA to disclose "the subject matter on which the witness is expected to present evidence" and "a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C).  It is apparent from the record that IAA did not represent that Mr. Potosnak would testify as to the KCE Model until it filed its Trial Witness List earlier this month. [*See* Filing No. 316.]  For this reason alone, Mr. Potosnak cannot testify regarding the KCE Model. Additionally, and in any event, any testimony regarding the KCE Model provided by Mr. Potosnak would be inadmissible.  Mr. Potosnak did not participate in the creation of the KCE Model, nor even see what data KCE used to create the KCE Model.  [Filing No. 282-1 at 46-47.]  Any testimony he would provide regarding the KCE Model would thus be hearsay and inadmissible.  Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter").  To the extent that IAA intends to present the KCE Model, those involved in creating the Model – presumably individuals at KCE – would need to provide testimony.

As to the KCE Document, again IAA did not advise Travelers that Mr. Potosnak would testify regarding the document until it filed its Trial Witness List.  Even if he is considered a hybrid witness, he cannot testify regarding the KCE Document because IAA did not comply with Fed. R. Civ. P. 26(a)(2)(C).  Further, testimony by Mr. Potosnak regarding the KCE Document would be inadmissible.  Mr. Potosnak created the KCE Document by using KCE's inspection reports and plotting where inspections occurred.  However, Mr. Potosnak testified that while he physically observed KCE's work, he did not accompany KCE and its personnel onsite every day, nor did he

15

ever work for KCE.  [Filing No. 238-10 at 25-26.]  Rather, Mr. Potosnak created the KCE Document for the purpose of IAA's insurance claim, and by reviewing inspection reports that were not created by him.  [*See* Filing No. 244-2 at 4.]  Accordingly, Mr. Potosnak does not have personal knowledge of the information contained in the KCE Document.  Additionally, the information contained in the KCE Document is not relevant to the sole issue remaining in this case – whether there are outstanding costs that relate to reasonably restoring the damaged property to its condition before the Shoring Tower Incident.  The KCE Document reflects inspections that took place between March 2007 and September 2007.  [Filing No. 282-3.]  It does not purport to separate those inspections between those related to reasonably restoring the property to its pre-loss condition, and those not related.  Any testimony Mr. Potosnak would provide regarding the KCE Document is not admissible because it would not assist the jury in determining which of those inspections were related to reasonably restoring the property to its condition before the Shoring Tower Incident – the only issue remaining in this litigation.[3]

Two areas of general testimony that IAA has identified – testimony regarding IAA's communications with Travelers (including documentation submitted to Travelers), and testimony that would demonstrate that the facts underlying Travelers' experts' opinions are incorrect – also are areas of testimony that IAA did not inform Travelers Mr. Potosnak would address until it filed its Trial Witness List, in violation of Rule 26(a)(2)(C).  As to testimony regarding IAA's communications with Travelers, however, the Court finds that Mr. Potosnak can testify as to facts related to those communications.  IAA has represented that Mr. Potosnak will not opine as to whether any

---

[3] To the extent the Court has misapprehended the nature of Mr. Potosnak's testimony regarding the KCE Model, the KCE Document, or any other subject, the Court again recognizes the vague nature of IAA's descriptions of Mr. Potosnak's testimony, and notes that it has done its best to address the issues raised in the pending motion despite this vagueness.

outstanding costs are covered by the Policy, so testimony regarding whether Mr. Potosnak believes a certain cost submitted to Travelers during the claims adjustment period should have been paid is not anticipated.  Any other testimony would appear to be factual in nature, and Mr. Potosnak can testify as to those facts assuming he is qualified to do so by virtue of knowledge he gained as the Project's OTR.  As to testimony related to facts that may contradict the facts underlying Travelers' experts' opinions, Mr. Potosnak can testify regarding facts he learned while the Project's OTR. He cannot offer opinions, however, regarding the validity of the facts underlying Travelers' experts' opinions.

The last category of testimony the Court will consider for Mr. Potosnak is also testimony IAA identified for the first time in its Trial Witness List filed on May 2, 2016, the same day that it filed its response to Travelers' Motion to Exclude.  IAA stated that Mr. Potosnak "is also expected to testify regarding his apportionment of engineering fees spent on the Shoring Tower Incident made during the Project."  [Filing No. 316 at 1.]  This category of testimony has become key to this case after the Court's summary judgment rulings, and is the most egregious example of IAA's failure to disclose the nature of Mr. Potosnak's testimony until the eleventh hour.  Again, whether or not Mr. Potosnak is treated as an expert witness or a hybrid witness, IAA had to at least disclose that Mr. Potosnak would provide apportionment testimony if it planned to offer that testimony at trial.  That testimony is clearly opinion testimony, and IAA's failure to disclose this testimony until including it in the description of Mr. Potosnak's testimony earlier this month in its Trial Witness List is particularly troubling to the Court given the history of this case.  That history indicates that Travelers repeatedly asked IAA to segregate or allocate outstanding costs into those covered by the Policy, and those not covered.  [*See, e.g.*, Filing No. 323-1 (August 10, 2012 letter from Travelers claims adjuster Elaine Bedard to IAA stating that "we were unable to identify and

correlate the amounts claimed to the coverage features of the policy," and providing a spreadsheet with spaces for the information Travelers was requesting (*e.g.*, the identity of each contractor, the amount presented for coverage to Travelers, and the coverage category) and a key defining the categories of requested information); Filing No. 323-3 at 2 (In an October 19, 2012 letter, Travelers acknowledging that IAA provided cancelled checks in response to Travelers' request but did not provide information regarding segregation of costs, and noting that Travelers had provided a "spreadsheet that was specifically designed to target the precise information and documentation we need to evaluate coverage as presented or revised").]

Specifically, many of Travelers' requests to segregate costs related to the Policy's General Coverage Provision. For example, Travelers stated in a July 10, 2013 letter that it was denying coverage for work "wholly unrelated to the shoring tower failure," including costs for work that took place prior to the date of loss, costs that were not associated with work at the airport, and duplicative costs. [Filing No. 238-16 at 10.] Travelers further stated that because IAA had not specifically identified outstanding costs that were "somehow related to the loss," it could not "acknowledge the causal relationship between [those costs] and the remainder of [the] claim." [Filing No. 238-16 at 11.] As to inspection costs, Travelers noted that it had already paid IAA "the entirety of the cost to perform a thorough assessment of the condition of the New Indianapolis Airport Terminal structure as impacted by the shoring tower incident." [Filing No. 238-16 at 12.]

Additionally, IAA served discovery requests asking IAA: (1) to "list each line item of cost and/or expense…that you seek to recover from Travelers which you claim are covered as loss to "Covered Property" from risks of direct physical loss," [Filing No. 238-15 at 10]; (2) to the extent IAA would not admit that Travelers had paid all amounts due under the Policy for risks of direct physical loss to "Covered Property," to "provide a detailed itemization (by line item and amount)

18

of all amounts for physical damage to 'Covered Property' which you claim Travelers has not paid you but which you should be paid," [Filing No. 238-15 at 17]; and (3) to state the dollar amount for which IAA sought recovery for post-loss investigations/inspections performed by KCE, and for each line item "provide a detailed explanation why you believe such items are covered" by the Policy, [Filing No. 238-15 at 29].  IAA has not disputed that it refused to provide an allocation, seeking all outstanding costs and, in some instances, claiming any allocation either was not available or was privileged.  [*See, e.g.*, Filing No. 238-15 at 10; Filing No. 238-15 at 17-18; Filing No. 238-15 at 29-32.]  Travelers' questioning of Mr. Potosnak during his deposition indicated even further that Travelers' position was that not all outstanding costs were related to reasonably restoring the damaged property to its pre-loss condition.  [*See, e.g.*, Filing No. 238-10 at 28 (Travelers' counsel questioning Mr. Potosnak regarding whether certain inspections were "inspections to determine what was necessary to get the new shoring towers into place").]

IAA's conduct indicates that it made a decision not to provide apportionment evidence to Travelers, hiding behind privilege, until it needed that evidence for trial.  This strategy of changing horses mid-stream does not comply with Rule 26, and is prejudicial to Travelers.  Furthermore, and independent of the fact that IAA did not disclose Mr. Potosnak's apportionment testimony until earlier this month, Mr. Potosnak testified repeatedly that he never attempted to apportion the outstanding costs, not even as of the date of his depositions.  [*See, e.g.*, Filing No. 238-10 at 4 (Mr. Potosnak testifying that he is not offering any opinions about matching up the costs to the Policy); Filing No. 238-10 at 22 (Mr. Potosnak testifying that he did not form an opinion about which costs were covered by the Policy during his time as OTR); Filing No. 238-10 at 24-26 (Mr. Potosnak testifying that he did not calculate which inspection costs were necessary to evaluate damage from the Shoring Tower Incident as opposed to inspection costs for other reasons).]  To the extent he

has later formed opinions regarding apportionment, those opinions were formed after he was re-hired in 2013 to assist with the litigation and, indeed, since his deposition in September 2015. Those opinions should have been disclosed long before now, but were not.

So, while Mr. Potosnak can testify regarding facts for which he has personal knowledge – perhaps, for example, that a line item related to fixing a steel beam – he cannot testify that the line item (or part of the line item) related solely to reasonably restoring the property to its condition before the Shoring Tower Incident. Testimony regarding those line items must be presented by witnesses whose testimony IAA disclosed in compliance with Rule 26, and who have actual knowledge of the substance of that work (for example the contractors or engineers that performed that work). Mr. Potosnak's testimony was not disclosed, and/or he has no such knowledge.

### 2. *Travelers' Other Arguments*

Because the Court has already determined that Mr. Potosnak's testimony that is factual in nature is admissible due to his role as OTR, and that opinion testimony by him regarding what portion of the outstanding costs related to reasonably restoring the property to its condition before the Shoring Tower Incident is not admissible, it need not consider Travelers' other arguments. Specifically, whether Mr. Potosnak is more properly categorized as an expert witness required to file an expert report, rather than a hybrid fact/expert witness need not be addressed because, in either event, IAA failed to provide the necessary disclosures. As discussed above, even if he were considered a hybrid factual/expert witness, Mr. Potosnak's opinion testimony regarding apportion-ment of costs and formed after IAA re-hired him in 2013 is not admissible because IAA did not timely disclose that testimony to Travelers. *See* Fed. R. Civ. P. 26(a)(2)(C) (witness not required to provide a report must still disclose the subject matter on which the witness will testify, and a summary of the facts and opinions to which the witness will testify). Additionally, whether Mr.

Potosnak is qualified to offer that opinion testimony, whether his opinions are unreliable or lack any defined methodology, whether those opinions are relevant[4] (and, if so, whether they are substantially more prejudicial than probative), and whether IAA unfairly inhibited discovery regarding those opinions are all moot issues, given the Court's rulings above.

In sum, the Court **GRANTS IN PART** Travelers' motion to Exclude Opinion Testimony of Richard Potosnak, [Filing No. 282], to the extent that Mr. Potosnak cannot testify regarding the KCE Document, the KCE Model, and any opinions or conclusions relating to any "apportionment" of costs between those related to reasonably restoring the damaged property to its pre-loss condition and those not related. As noted above, the general nature of IAA's description of Mr. Potosnak's testimony has made it difficult for the Court to rule on Travelers' motion, and has made the Court's ruling somewhat general in nature as well. Both parties, however, should expect that any evidentiary disputes that arise during trial will be resolved consistent with this Order.

## IV.
### TRAVELERS' MOTION TO EXCLUDE THE OPINION TESTIMONY OF MARK FLANDERMEYER

**A. Relevant Background**

*1. Mr. Flandermeyer's Role*

Mr. Flandermeyer worked for Hunt/Smoot and was assigned to the Project from February 2005 until 2009. [Filing No. 284-2 at 5.] His title was project manager, and he was onsite every day during the construction phase of the Project. [Filing No. 284-2 at 5-9.] Hunt/Smoot performed budget control for IAA in connection with the Project, and Mr. Flandermeyer made sure various

---

[4] The Court notes, however, that any opinion testimony Mr. Potosnak would proffer would not be relevant because the only remaining issue in the litigation is whether any outstanding costs were to reasonably restore the damaged property to its condition before the Shoring Tower Incident. Mr. Potosnak specifically testified that he did not perform any analysis to segregate costs between those related to reasonably restoring the damaged property to its pre-loss condition and those not related.

contractors performed in accordance with their contractual obligations and also worked to keep the Project within budget. [Filing No. 284-2 at 3-7.] Mr. Flandermeyer also was responsible for scheduling the work for the Project. [Filing No. 284-2 at 7-8.]

       2. *The Nature of Mr. Flandermeyer's Anticipated Testimony*

As with Travelers' Motion to Exclude Mr. Potosnak's opinion testimony, Travelers filed its Motion to Exclude Mr. Flandermeyer's opinion testimony before the Court had ruled on the cross motions for summary judgment, which significantly narrowed the issues in the litigation. So again, it is important to determine the testimony that IAA intends to offer from Mr. Flandermeyer given the Court's ruling. IAA disclosed Mr. Flandermeyer as a "hybrid fact/expert witness" on November 17, 2014. [Filing No. 169-21.] In the disclosure, IAA described Mr. Flandermeyer's anticipated testimony as follows:

> Mr. Flandermeyer will testify on factual matters regarding the construction of the Project; the events surrounding the [Shoring Tower Incident]; the costs incurred due to the Shoring Tower Incident; and actions taken and decisions made during the course of the Project, some of which may constitute expert opinion. Among other things, Mr. Flandermeyer is expected to testify that after the Shoring Tower incident, Hunt/Smoot prepared a schedule projecting the dates of completion for the Project using ordinary, reasonable speed and similar materials and workmanship as originally planned, without employing acceleration, resequencing or extraordinary measures to reduce the delay…. Mr. Flandermeyer is expected to testify that the reason for the delay between the originally planned completion dates and the dates set forth in AIRPORT_0011875 was the Shoring Tower Incident. He is also expected to testify that the reason for the delay between the originally planned completion dates and the actual completion dates also was due to the Shoring Tower Incident. Mr. Flandermeyer also is expected to testify that costs on AIRPORT_0018122-130 were related to the Shoring Tower Incident.

[Filing No. 169-21 at 2-3.]

In its Trial Witness List, IAA described Mr. Flandermeyer's testimony as follows:

Mr. Flandermeyer is expected to testify as to the construction of the Project; his role on the Project; the circumstances of the Shoring Tower Incident; the effects of the Shoring Tower Incident on the Project; steps taken to address the Shoring Tower Incident, including the hiring of a forensic engineer (KCE); the work performed by

> KCE and its subconsultants; how KCE's work impacted the Project; IAA's pay-
> ment of KCE's costs and fees; IAA's communications with Travelers, including
> documentation submitted to Travelers; and IAA's claimed damages. Mr. Flander-
> meyer is also expected to testify regarding the apportionment of engineering fees
> spent to address the weld indicate issue during the Project. Mr. Flandermeyer may
> also testify as to information contained in IAA's answers and responses to Travel-
> ers' discovery requests, as well as the subjects addressed in his deposition.

[Filing No. 316 at 1-2.] As noted, IAA never provided a Rule 26(a)(2)(B) report from Mr. Flan-

dermeyer.

IAA now states that it will not offer certain testimony from Mr. Flandermeyer in light of

the Court's rulings on the summary judgment motions. Specifically, IAA states that it: (1) "no

longer plans to offer testimony from Mr. Flandermeyer that each and every cost reflected on AIR-

PORT_0018122-130 and totaling $9,278,228.12 was incurred because of the Shoring Tower Inci-

dent," [Filing No. 314 at 6]; (2) "does not plan on eliciting opinion testimony from Mr. Flander-

meyer regarding the [schedule for repair work and the completion dates of the Project in light of

the Shoring Tower Incident]," [Filing No. 314 at 7]; and (3) "will not offer opinion testimony from

Mr. Flandermeyer regarding the [KCE Document]," [Filing No. 314 at 9]. IAA does state, how-

ever, that it will offer from Mr. Flandermeyer:

- "factual testimony that contradicts the assumptions underlying Travelers' ex-
  perts' opinions," [Filing No. 314 at 3]; and

- Testimony "regarding the facts or general conclusions regarding certain [costs]
  that appear on AIRPORT_0018122-130, which were reached in his capacity as
  the project manager," [Filing No. 314 at 6].

### B. Discussion

Travelers argues that Mr. Flandermeyer should not be permitted to offer opinion testimony

because: (1) his opinions were not formed in the normal course of his duties or activities in con-

nection with the Project, but rather were formed post-litigation, so IAA was required to file an

expert report regarding his opinions; (2) Mr. Flandermeyer is not qualified to offer opinion testimony; (3) Mr. Flandermeyer's opinions do not meet the standards for reliability and relevance; (4) Mr. Flandermeyer's opinion testimony is not relevant; and (5) the opinion testimony has little probative value, which is outweighed by the danger of unfair prejudice to Travelers.  [Filing No. 285 at 5-18.]

Much like Mr. Potosnak's testimony, IAA has been vague about what exactly it intends to offer from Mr. Flandermeyer.  Again, this has made the Court's review of the pending motion difficult.  The Court finds at the outset, however, that it need not consider every category of testimony the parties discuss.  IAA has conceded it will not introduce certain testimony from Mr. Flandermeyer, but then goes on to address that testimony anyway.  [*See, e.g.*, Filing No. 314 at 7 (IAA stating that it will not present testimony from Mr. Flandermeyer regarding the schedule for various milestones for the Project, but then stating that he should not be precluded from providing that testimony to the extent it is relevant at trial and discussing its relevance for a page and a half).] The Court is not in the business of providing advisory opinions, and will not spend judicial resources setting forth whether IAA can introduce evidence that it has conceded it does not plan to introduce in the event that IAA changes its mind.  *See FCC v. Airadigm Communs., Inc.*, 616 F.3d 642, 654 (7th Cir. 2010) ("federal courts are not authorized to issue advisory opinions"); *On-Site Screening, Inc. v. United States*, 687 F.3d 896, 900 (7th Cir. 2012) ("federal courts do not give advisory opinions on claims not before them") (citing *Rodas v. Seidlin*, 656 F.3d 610, 630 (7th Cir. 2011) ("Federal courts are not in that business")).

The Court will only consider the testimony IAA has affirmatively represented it intends to present: (1) "factual testimony that contradicts the assumptions underlying Travelers' experts' opinions," [Filing No. 314 at 3]; and (2) testimony "regarding the facts or general conclusions

regarding certain [costs] that appear on AIRPORT_0018122-130, which were reached in his capacity as the project manager," including apportionment of engineering fees spent to address the weld indicate issue during the Project, [Filing No. 314 at 6; Filing No. 316 at 1-2].

As to those categories of testimony, Travelers argues that Mr. Flandermeyer cannot testify to contradict Travelers' experts' opinions because reviewing and analyzing the expert reports was not part of his regular job duties, and he is not qualified to provide that testimony. [Filing No. 285 at 7-8.] Travelers also argues that Mr. Flandermeyer cannot testify as to which costs related to reasonably restoring the damaged property to its pre-loss condition because he testified at his deposition that he had not undertaken that type of analysis, had not reviewed the Policy, and is not qualified to segregate the costs in that way. [Filing No. 285 at 10; Filing No. 285 at 14-16.] Travelers also asserts that Mr. Flandermeyer's opinion testimony is not relevant to the remaining issue in the litigation, and that any probative value to his opinion is outweighed by potential prejudice to Travelers. [Filing No. 285 at 16-17.]

IAA responds that Mr. Flandermeyer will only offer factual testimony that contradicts the facts underlying Travelers' experts' opinions, and the testimony will consist of facts and knowledge he gained while working on the Project. [Filing No. 314 at 3.] IAA asserts that even if this testimony is considered opinion testimony, it is admissible because it arises from his role working on the Project. [Filing No. 314 at 4-5.] As to testimony regarding the segregation of costs, IAA has limited Mr. Flandermeyer's testimony to "the facts or general conclusions regarding certain of these costs, that appear on AIRPORT_0018122-130, which were reached in his capacity as the project manager." [Filing No. 314 at 6.] IAA argues that this testimony is simply factual in nature, but if considered expert testimony, then Mr. Flandermeyer is qualified to provide it and it is relevant. [Filing No. 314 at 6.]

On reply, Travelers reiterates its arguments and also points out that IAA never disclosed any analysis Mr. Flandermeyer performed regarding segregating costs. [Filing No. 334 at 4-5.] Travelers argues that it would be prejudiced if this eleventh-hour testimony is allowed. [Filing No. 334 at 5.]

First, like Mr. Potosnak, Mr. Flandermeyer may testify regarding facts of which he has personal knowledge, but may not testify that facts underlying Travelers' expert reports are incorrect. Testimony regarding facts of which he has personal knowledge may be admitted and used in argument to demonstrate a contradiction, but Mr. Flandermeyer may not testify that a contradiction exists. Whether or not Mr. Flandermeyer is considered a hybrid witness or an expert witness, IAA has not disclosed that Mr. Flandermeyer would testify to contradict Travelers' experts' opinions. Accordingly, such opinion testimony is prohibited, and IAA has not provided any justification for its last minute addition, nor rebutted Traveler's claim or prejudice.

Second, as to costs incurred during the Project, and which costs relate to reasonably restoring the damaged property to its condition before the Shoring Tower Incident, the Court reaches the same conclusion it reached regarding that type of testimony from Mr. Potosnak. Mr. Flandermeyer can testify as to facts he learned while working on the Project, but may not offer his opinion regarding whether certain costs related to reasonably restoring the property to its condition before the Shoring Tower Incident. Like Mr. Potosnak, Mr. Flandermeyer testified that he had never attempted to segregate or apportion costs to separate out those which related to reasonably restoring the property to its pre-loss condition. [*See, e.g.*, Filing No. 238-6 at 8-10.] Moreover, also like Mr. Potosnak, IAA disclosed that Mr. Flandermeyer would testify regarding apportionment for the first time earlier this month, when it filed its Trial Witness List. Making the link between costs incurred by IAA and whether those costs related to reasonably restoring the property to its pre-loss

26

condition requires the testimony of an expert, who has been properly disclosed to Travelers, who has filed an expert report, and who Travelers has had an opportunity to question regarding his conclusions on the topic of apportionment.  Mr. Flandermeyer is not that person.

The Court **GRANTS IN PART** Travelers' Motion to Exclude the Opinion Testimony of Mark Flandermeyer, [Filing No. 284], to the extent that Mr. Flandermeyer is not permitted to provide opinion testimony regarding the correctness of the facts underlying Travelers' experts' opinions or the apportionment of costs incurred by IAA between those related to reasonably restoring the damaged property to its condition before the Shoring Tower Incident, and those not related. The Court **DENIES AS MOOT** Travelers' motion as to the additional categories of testimony discussed herein because IAA has stated that it will not present such testimony.

## V.
### CONCLUSION

In ruling on the pending motions, the Court has found significant the undisputed fact that Travelers repeatedly asked IAA during the claims adjustment process to segregate costs between those covered by the Policy and those not covered – and even, specifically, between those related to the Shoring Tower Incident and those not related.  After IAA filed this lawsuit, Travelers continued to seek this information, serving discovery requests and attempting to obtain cost segregation information from Mr. Potosnak during his deposition.  Travelers met with resistance from IAA at every turn, but IAA has now, just a few weeks ago, represented that Mr. Potosnak and Mr. Flandermeyer will provide testimony at trial regarding the information Travelers has been seeking. This eleventh-hour designation is contrary to the "just, speedy, and inexpensive determination" of this proceeding, Fed. R. Civ. P. 1, and the discovery process.

IAA cannot establish that certain costs are related to reasonably restoring the damaged property to its pre-loss condition without expert testimony.  It would seem that this testimony

might have been developed by IAA through either an expert witness, or through the use of the actual contractors who performed the work of restoring the property – and, consequently, could competently testify to the nature of that work. IAA cannot use Mr. Potosnak or Mr. Flandermeyer as stand-ins for those individuals. They do not have the requisite knowledge to testify as to those issues and, in any event, IAA did not disclose that it intended to use them to provide that testimony until the month before trial and, disturbingly, after refusing over and over again to provide information regarding segregation of costs to Travelers.

Travelers all along has maintained that only costs related to reasonably restoring the damaged property to its pre-loss condition were covered under the Policy. Whether or not IAA agreed, Travelers' position was no surprise and the Court's finding that Travelers' interpretation was correct was not out of the blue. IAA chose a certain strategy – not to provide Travelers with cost segregation information, and not to hire an expert to perform such a segregation – and cannot now attempt to meet its burden of proof through unqualified witnesses whose testimony on these issues was not disclosed. Put simply, Mr. Potosnak and Mr. Flandermeyer cannot now be used to fill the gaps in IAA's case.

Accordingly, for the foregoing reasons, the Court **GRANTS IN PART** Travelers' Motion to Exclude Opinion Testimony of Richard Potosnak, [Filing No. 282], to the extent that Mr. Potosnak cannot testify regarding the KCE Document, the KCE Model, any opinions regarding the correctness of the facts underlying Travelers' experts' opinions, or any opinions or conclusions relating to any "apportionment" of costs between those related to reasonably restoring the damaged property to its pre-loss condition and those not related. Additionally, the Court **GRANTS IN PART** Travelers' Motion to Exclude the Opinion Testimony of Mark Flandermeyer, [Filing No. 284], to the extent that Mr. Flandermeyer is not permitted to provide opinion testimony regarding

the correctness of the facts underlying Travelers' experts' opinions, or any opinions regarding apportionment of costs incurred by IAA between those related to reasonably restoring the damaged property to its condition before the Shoring Tower Incident, and those not related.   The Court **DENIES AS MOOT** Travelers' Motion to Exclude the Opinion Testimony of Mark Flandermeyer as to the additional categories of testimony discussed therein, because IAA has stated that it will not present such testimony.

Date:  May 23, 2016

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

29